THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BAPTIST HEALTHCARE OF OKLAHOMA, LLC d/b/a )
INTEGRIS BASS BAPTIST HEALTH CENTER )
600 South Monroe )
Enid, Oklahoma 73702 )
)
INTEGRIS BAPTIST MEDICAL CENTER, INC. )   Case No.
3300 Northwest Expressway )
Oklahoma City, Oklahoma 73112 )
)
       Plaintiffs, )
)
v. )
)
XAVIER BECERRA, Secretary, )
United States Department of )
Health and Human Services, )
200 Independence Avenue S.W. )
Washington, District of Columbia 20201, )
)
       Defendant. )
                                               )

**COMPLAINT FOR JUDICIAL REVIEW AND DECLARATORY
AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT**

**NATURE OF ACTION**

1. This is an action for judicial review of Defendant's final Medicare payment determination for two Oklahoma safety-net hospitals that serve a large proportion of low-income patients. After allowing the administrative appeal to languish for nearly seven years, Defendant's review board ultimately issued a final decision that conflicts with the controlling statute and the agency's own regulation, makes findings not grounded in the record, creates unexplained inconsistencies, and retroactively applies a new payment standard that was unlawfully adopted.

2. The dispute concerns an oft-litigated Medicare payment adjustment for hospitals that serve a disproportionate share of low-income patients. That *Medicare* disproportionate share

hospital ("DSH") payment adjustment depends in part on a hospital's percentage of days for patients eligible for *Medicaid*.

3. Plaintiff hospitals operate inpatient hospital psychiatric units for high-risk children and adolescents with life-threatening or self-injurious behaviors that require 24-hour medical supervision, the vast majority of whom are eligible for Medicaid. After years of determining that the child and adolescent psychiatric days for Medicaid patients in these hospital units should be included as Medicaid eligible days in the DSH calculation, Defendant's contractor abruptly changed course in 2015 and began excluding these days for the first time. The exclusion of these inpatient hospital patient days from the DSH calculation has cost Plaintiff hospitals $91 million to date.

4. Notwithstanding its decision to conduct an "expedited" hearing nearly seven years ago in June 2016, Defendant's review Board only recently affirmed the contractor's exclusion of these days from the DSH calculation, largely relying on a label used by the State of Oklahoma Medicaid agency to differentiate payment levels for services furnished within these inpatient psychiatric units. The Board reached this conclusion despite record evidence demonstrating that Plaintiff hospitals' units met all the statutory and regulatory requirements for inclusion in the DSH calculation, and in the face of evidence from the State that the labels at issue were not indicative of the level of care provided in these units.

5. The Board's decision is unlawful and should be set aside for multiple reasons. First, the Board's decision to limit patient days in the DSH calculation to only those areas of the hospital that provide "acute care services generally payable under the [inpatient] prospective payment system," is contrary to the controlling statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Neither the plain language nor legislative history of the statute supports Defendant's assertion that certain areas

of a hospital can be excluded from the DSH calculation based on the services provided or their location. The decision also contradicts the controlling DSH regulation and the intent behind it as the units provide the kind of services that are generally payable under the Medicare inpatient payment system. 42 C.F.R. § 412.106(a)(1)(ii) (2007). The Board's conclusion to the contrary ignores key pieces of the record evidence, including undisputed facts that the units are located in inpatient areas of the hospital, that the beds are licensed as inpatient beds, that the hospitals billed the services with diagnosis codes payable under the Medicare inpatient hospital payment system, among others, and is therefore not based on substantial evidence and is arbitrary and capricious.

6. Defendant's decision is also arbitrary and capricious for other reasons, including that the agency has still not adequately explained why Medicaid patient days in other units that do not provide services generally payable by Medicare as inpatient services are included in the DSH calculation and these inpatient psychiatric days are not so included. Further, Defendant changed his approach toward the treatment of these inpatient psychiatric units in the DSH payment calculation for 2007 without undergoing notice-and-comment-rulemaking and without otherwise providing fair notice required by law.

7. Plaintiff hospitals request an order setting aside the Board's decision in this case and directing the Secretary to pay Plaintiff hospitals additional amounts due consistent with that decision plus interest.

## JURISDICTION AND VENUE

8. This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*.

9. Jurisdiction is proper under 42 U.S.C. § 1395oo(f)(l).

10. Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(l).

## PARTIES

11. The Plaintiff hospitals in this action are: INTEGRIS Baptist Medical Center, Inc. (Medicare Provider Number 37-0028) and Baptist Healthcare of Oklahoma, LLC d/b/a INTEGRIS Bass Baptist Health Center (Medicare Provider Number 37-0016).

12. The defendant is Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services ("Secretary"), the federal agency that administers the Medicare program. References to the Secretary herein are meant to refer to him, to his subordinates, and to his official predecessors or successors as the context requires.

13. The Centers for Medicare & Medicaid Services ("CMS") is the component of the Secretary's agency with responsibility for day-to-day operation and administration of the Medicare program. CMS was formerly known as the Health Care Financing Administration. References to CMS herein are meant to refer to the agency and its predecessors.

## LEGAL AND REGULATORY BACKGROUND

### Medicare DSH Payment

14. Part A of the Medicare Act covers "inpatient hospital services." 42 U.S.C. § 1395d(a)(l). Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under the prospective payment system ("IPPS") under subsection (d) of Section 1886 of the Social Security Act. *Id.* § 1395ww(d)(l)-(5); 42 C.F.R. Part 412. The inpatient prospective payment system applies to inpatient hospital services furnished by a "subsection (d) hospital." 42 U.S.C. § 1395ww(d)(1)(A).

15. Under the inpatient prospective payment system, Medicare pays predetermined, standardized amounts per discharge, subject to certain payment adjustments. *Id.* § 1395ww(d)(l)-(5); 42 C.F.R. Part 412. One such payment adjustment is the Medicare disproportionate share hospital ("DSH") payment. *See* 42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106. Congress

4

enacted the DSH payment because it found that hospitals treating a large population of low-income patients tend to incur higher operating costs per case for all discharges. H.R. Rep. No. 99-241(I), at 15 (1985), *as reprinted in* 1986 U.S.C.C.A.N. 579, 593-94. Congress found hospitals treating a large share of low-income patients generally have higher operating costs due to additional structural costs reflecting "extra overhead costs and higher staffing ratios" that reflect the need for special personnel, higher security, and "high standby costs" to maintain special units like trauma, emergency psychiatric, and neonatal intensive care units. *Id.* at 16. Plaintiffs are Medicare-participating hospitals that treat low-income patients and receive DSH payments for the higher costs incurred by hospitals that treat low-income patients.

16. The amount of the DSH payment owed to a qualifying hospital is determined by two fractions, one of which, pertinent here, is referred to in this Complaint as the "Medicaid fraction." The statute defines the Medicaid fraction as:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX [the Medicaid program], but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

17. The question of which categories of patient days should be included in the DSH calculation was the subject of litigation in *Alhambra Hospital v. Thompson*, 259 F.3d 1071, 1075 (9th Cir. 2001). *Alhambra* addressed whether the DSH calculation should include the days Medicaid eligible patients in an area of a hospital used to provide only "subacute" skilled nursing care services. *Id.* at 1073. The Ninth Circuit concluded the days should be included in the DSH calculation because the plain language of the regulation in effect at that time called for the inclusion of patient days "attributable to areas of the hospital that are subject to the [inpatient] prospective

payment system" and the "subacute" units at issue were in such areas of the hospital. *Id.* at 1074-75.

18.  In response to the *Alhambra* decision, in 2003, the agency amended the DSH regulation. 42 C.F.R. § 412.106(a)(1)(ii) (2007); 68 Fed. Reg. 45,346, 45,416-18 (Aug. 1, 2003). As amended, the regulation provides that for purposes of the DSH calculation, "the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the [Medicare inpatient] prospective payment system." 42 C.F.R. § 412.106(a)(1)(ii) (2007). Put differently, the regulation counts only the patient days in areas of a hospital that provide inpatient hospital services that would be payable under the inpatient prospective payment system and thus excludes patient days, like those at issue in *Alhambra*, in non-exempt areas that do not provide any inpatient hospital services that would be payable under the inpatient prospective payment system. The agency's stated intention was not to "focus on the level or type of care provided to individual patients in a unit, but rather on the level and type of care provided in the unit as a whole." 68 Fed. Reg. at 45,417.

19.  The regulation also identified specific categories of patient days "otherwise countable" that nonetheless are excluded from the DSH payment calculation, including: 1) patients treated in beds in so-called "distinct part" units that by statute are excluded from the inpatient prospective payment system; 2) beds used for outpatient observation, skilled nursing swing beds, or inpatient hospice; 3) unoccupied beds that have not provided an inpatient level of care in the preceding three months; and 4) beds that are otherwise occupied that could not be made available for inpatient use within 24 hours. *See* 42 C.F.R. § 412.106(a)(1)(ii) (2007). The agency also separately clarified that when a hospital furnishes services that Medicaid covers in a healthy newborn nursery that does not generally provide services that would be covered by Medicare as

inpatient hospital services, the Medicaid-covered patient days in that area are nonetheless counted in the DSH payment calculation. 68 Fed. Reg. at 45,417. Although the "costs, days, and beds associated with a healthy newborn nursery are excluded from inpatient calculations for Medicare purposes" because "Medicare does not generally cover services for infants," the Medicaid-covered patient days in the healthy newborn nursery are counted in the DSH payment calculation because "Medicaid does offer extensive coverage to infants, and nursery costs would be directly included in calculating Medicaid hospital inpatient care costs." *Id*.

### Medicaid Child Inpatient Hospital Psychiatric Services Benefit

20. Medicaid is a joint Federal and state program established in Title XIX of the Social Security Act (the "Act"). 42 U.S.C. § 1396; 42 C.F.R. § 430.0. To participate in the Medicaid program and receive Federal funding, a State must obtain CMS approval of a "State plan" that meets Federal requirements. A State makes Medicaid payment only for categories of "medical assistance" authorized by the Federal Medicaid statute and its State plan. 42 U.S.C. §§ 1396b(a)(1) (providing for matching funds at a Federal medical assistance percentage for "medical assistance under the State plan"), 1396d(a) (defining "medical assistance").

21. Since 1972, the Medicaid statute has provided "medical assistance" in the form of payment for "inpatient psychiatric hospital services for individuals under age 21." *Id*. § 1396d(a)(16) and (h); Social Security Amendments of 1972, Pub. L. No. 92-603 § 299B, 86 Stat. 1329, 1460-61. These inpatient hospital services are covered by Medicaid when provided in a hospital or "another inpatient setting that the Secretary has specified in regulations." 42 U.S.C. § 1396d(h)(1)(A).

22. The Medicaid statute further defines inpatient psychiatric hospital services as involving active treatment provided by a treatment team, consisting of physicians and other qualified personnel who have determined that the services are "necessary on an inpatient basis"

7

and are reasonably expected to improve the patient's condition to the "extent that eventually such services will no longer be necessary." *Id.* § 1396d(h)(1)(B). The regulations governing the child inpatient psychiatric hospital benefit generally track the Federal statute. 42 C.F.R. §§ 440.160, 441.150 *et seq.*

23. In order for any of the care to be paid under Medicaid as inpatient psychiatric hospital services, the State must find that these statutory and regulatory requirements for those services are met. *See id*. § 441.150. The obligation to ensure that these services are appropriate is a continuing one, as CMS's regulations require the treatment team to review the patient's plan of care every 30 days to recommend changes based on the patient's adjustment to inpatient status as well as to determine that "services being provided are or were required on an inpatient basis." *Id*. § 441.155(c)(1). Through this process, Medicaid ensures that inpatient hospital care is appropriate for a given patient.

### Oklahoma Medicaid Payment for Child Inpatient Hospital Psychiatric Services

24. Consistent with the Federal requirements, the Oklahoma Medicaid program provides coverage for inpatient psychiatric hospital services furnished to patients under the age of 21. *See* Okla. Admin. Code §§ 317:30-5-95 – 96 (2007). As the State faced funding issues, it began to explore ways to cut payment rates for these services, and ultimately adopted varying payment rates for different categories of Medicaid-covered inpatient psychiatric hospital services (categories not contemplated by the Federal Medicaid rules). In the early 1990s, the State began making a distinction, for payment purposes, between covered inpatient psychiatric hospital services that the State classified as "acute" or "residential." The State also refers to the services labeled "residential" as "psychiatric residential treatment facility" or "PRTF" care. However, the State has been explicit in correspondence with Defendant confirming that regardless of the manner

in which it pays for the inpatient psychiatric hospital services, all services are acute inpatient hospital services, and highlights that the staffing and care levels are the same regardless of the terms used for reimbursement. Furthermore, the State legislature has also confirmed that all Medicaid-covered psychiatric services provided to persons under the age of 21 who are admitted as inpatients in a hospital in Oklahoma are acute, inpatient hospital services, regardless of the level of state Medicaid reimbursement provided.

25. Prior to 2005, the State paid a per diem rate for all inpatient hospital services, including inpatient psychiatric hospital services to patients under 21 years of age. The State Medicaid program paid for these services at two different per diem rates: a hospital-specific rate for one subcategory of Medicaid covered inpatient psychiatric hospital services labeled by the State as "acute" and a statewide per diem rate for another subcategory of those Medicaid covered inpatient psychiatric hospital services labeled by the State as "residential."

26. Beginning on October 1, 2005, the State switched to a diagnosis related group ("DRG") reimbursement method for the "acute" subcategory of Medicaid covered inpatient psychiatric hospital services. For the subcategory of "residential" inpatient psychiatric hospital services, the State continued to pay per diem rates.

27. All of these inpatient hospital psychiatric services, regardless of the differences in payment classifications and rates, are covered and paid under the singular federal Medicaid benefit covering "inpatient psychiatric hospital services furnished to patients under the age of 21," as reflected in implementing State regulations. *See* Okla. Admin. Code § 317-30-5-96.3 (2007) (describing methods of payment for inpatient psychiatric services). Indeed, the State has confirmed that regardless of the manner in which it pays for the days under this Federal benefit, it considers all services to be acute inpatient hospital services, and highlights that the staffing and

care levels are the same regardless of the terms used for reimbursement. Furthermore, pre-authorization from the State is required for all inpatient hospital psychiatric services for children and adolescents under 21. *Id*. § 317-30-5-95.24 (2007). For acute care payment, a patient must have a specific psychiatric diagnosis with symptoms that could not be managed in a less secure setting and also demonstrate behavior in the previous 48 hours that presents an imminent life-threatening emergency that requires 24-hour nursing and medical supervision. *Id*. § 317-30-5-95.25 (2007). The admission criteria for services paid by the State as residential are largely the same as for acute payment except that the patient must have received prior treatment under the acute payment methodology and within the previous 14 days the patient must show an escalating pattern of self-injurious or assaultive behaviors that require 24-hour observation and treatment. *Id*. § 317-30-5-95.29.

28.   The State also imposes requirements on hospitals that provide inpatient psychiatric hospital services to patients under 21 years of age, chief among them that the hospital beds must be licensed with the State as inpatient hospital beds in order to receive payment at the acute level, and that the hospital beds must be licensed with the State as residential treatment beds in order to receive payment at the residential level. *Id*. § 317-30-5-95.

### Medicare Appeals Process

29.   After the close of each fiscal year, a hospital is required to file a cost report with a Medicare Administrative Contractor designated by the Secretary. 42 C.F.R. §§ 413.20, 413.24. The contractor analyzes a hospital's cost report and issues a payment determination, known as a notice of program reimbursement or "NPR" regarding the amount of Medicare program reimbursement due the hospital for services furnished to Medicare beneficiaries during the fiscal year covered by the cost report. *See id*. § 405.1803.

30. A hospital may appeal a contractor's determination as to the total amount of Medicare program reimbursement due the hospital for a cost reporting period to an administrative tribunal called the Provider Reimbursement Review Board ("PRRB" or "Board"), which is comprised of five members appointed by the Secretary. *See* 42 U.S.C. §§ 1395oo(a)(1), (h); 42 C.F.R. §§ 405.1835 - 405.1877.

31. A hospital that is dissatisfied with a final decision from the Board may bring an action in this Court to challenge the decision within 60 days of reception of notice of the decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

## FACTS SPECIFIC TO THIS CASE

32. Both Plaintiff hospitals are Medicare "subsection (d) hospitals" that qualify as Medicare DSH hospitals and operate departments with units that furnish inpatient psychiatric hospital services to patients under the age of 21 in the State of Oklahoma.

33. During the period at issue, INTEGRIS Baptist Medical Center operated a number of child and adolescent psychiatric units in a hospital department known as INTEGRIS Mental Health Spencer. Spencer treats children and adolescents with a variety of psychiatric illnesses, including major depression, post-traumatic stress disorder, and psychotic and affective disorders. It is the only mental health unit in the State, and one of only a few in the nation, to specialize in the treatment of mentally ill children with sexually aggressive behaviors. For the 2007 year at issue, approximately 97 percent of the patients treated at Spencer were eligible for Medicaid.

34. INTEGRIS Bass Baptist Health Center operated a number of child and adolescent psychiatric units in a hospital department known as INTEGRIS Meadowlake. Like Spencer, Meadowlake also treats children and adolescents with a variety of psychiatric illnesses. In addition, Meadowlake is home to a special unit that accepts adolescents with multiple diagnoses

of developmental disabilities and emotional disorders. Approximately 85 percent of the patients at issue treated at Meadowlake during the 2007 cost year were eligible for Medicaid.

35. All of the beds in these units are used to provide inpatient psychiatric hospital services that are reimbursed by the State as both "acute" and "residential" and none of the units are segregated by reimbursement level. As required by the State, all beds in the facilities are dually licensed both as inpatient hospital beds and residential treatment beds.

36. For many years, the hospitals were permitted to include the inpatient days paid by Medicaid in the Medicaid fraction of their DSH calculations. However, in 2015, the agency's contractor abruptly changed course, and issued final payment determinations disallowing the majority of Medicaid patient days from these psychiatric units from the Medicaid fraction for the hospitals' cost reporting periods ending in 2007. Defendant's contractor did not remove the Medicaid patient days for INTEGRIS Bass Baptist Health Center that were classified as "acute," but instead only removed those days that were classified as "residential" for Medicaid payment purposes, while at the same time disallowing all "acute" and "residential" days at INTEGRIS Baptist Medical Center during its concurrent audit process.

37. Plaintiff hospitals both properly filed appeals of the contractor's payment determinations to the Board in one group appeal on July 30, 2015, which the Board assigned case number 15-3079GC.

38. Given the passage of time even at that point since the 2007 cost year and the substantial amount in controversy, Plaintiff hospitals shortly thereafter requested that the Board conduct an expedited hearing, which the Board granted and held a live hearing on June 21, 2016.

39. Nearly seven years later, on February 17, 2023, the Board finally issued its decision in Plaintiff hospitals' administrative appeal. *See* Ex. A. In the decision, the Board excluded the

patient days from Plaintiff hospital's inpatient child and adolescent psychiatric units because the "level of care was not equivalent to the psychiatric acute care services provided in a short-term acute care hospital subject to the [inpatient prospective payment system] and, thus, is not generally payable under the [inpatient prospective payment system]." *Id*. at 42.  The Board also concluded that because the regulation requires each unit to be evaluated as a whole as to whether the patient days can be included in the DSH calculation, and because neither of the Plaintiff hospitals' units provided care that qualified for the DSH payment on the whole, that the days paid as "acute" by the State at INTEGRIS Bass Baptist Health Center must also be excluded.  The Board made this finding despite the fact that the contractor initially determined those days should be included in the DSH calculation.  *Id*.  The Board reached these conclusions in the face of clear evidence presented by Plaintiff hospitals demonstrating that the care furnished in the units is generally payable under the Medicare inpatient prospective payment system, including evidence that the payment codes assigned for the care are payable under the inpatient prospective payment system, and that the State itself did not intend for payment differences to indicate non-acute level of care.

40.     In its decision, the Board also concluded its decision to uphold the contractor's disallowances was not arbitrary and capricious as compared to other units such as those for healthy newborns that are included in the DSH calculation, concluding Plaintiff hospitals' arguments to the contrary were "irrelevant." *Id*. at 40-41.  On the question of whether Plaintiff hospitals had the requisite fair notice in advance of the contractor's payment determinations, the Board's decision concluded Plaintiff hospitals had adequate notice when the agency changed its regulation in 2003 in response to *Alhambra*.  *Id*. at 41-42.  The Board did not address Plaintiff hospitals' other procedural arguments that, under the Medicare statute, this change required notice-and-comment rulemaking before becoming effective and could not be made retroactively.  While the Board

acknowledged Plaintiff hospitals' argument that the contractor's view conflicts with the controlling DSH statute by excluding patient days from certified inpatient areas of the hospital, *id.* at 10-11, the Board did not otherwise opine on that argument in its decision.

41.    By the filing of this Complaint, Plaintiff hospitals have properly commenced this action for judicial review under 42 U.S.C. § 1395oo(f)(1).

## ASSIGNMENT OF ERRORS

42.    The Medicare statute provides for judicial review of the questions presented here "pursuant to the applicable provisions under chapter 7 of title 5," *i.e.*, the Administrative Procedure Act ("APA"). 42 U.S.C. § 1395oo(f)(l).

43.    The applicable provisions of the APA provide that the "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2). In applying this standard, the determinations at issue should be found unlawful and set aside including for the reasons detailed below.

**Count I: The Board's Decision is Contrary to Law and in Excess of Statutory Authority**

44.    Plaintiff hospitals repeat the allegations in paragraphs 1–43 of this Complaint as if fully set forth herein.

45.    The Board's decision limiting inclusion in the DSH calculation to only those areas of the hospital that provide "acute care services generally payable under the [inpatient] prospective payment system," is contrary to the DSH statute. The pertinent statutory text looks to the "patient days" of a "hospital" for a "cost reporting period." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). There is no statutory authority to reduce the Medicaid fraction by excluding the patient days in an area

14

of an inpatient hospital based on the proportion of the services furnished in that area or unit that are payable under the inpatient prospective payment system or otherwise. *See Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007) (interpreting statutory terms in accordance with "their ordinary or natural meaning" where there "is nothing to suggest that Congress" intended otherwise (internal quotation marks omitted)). It is also inconsistent with the purpose and intent of the DSH payment adjustment. CMS has provided no reason for the exclusion of the patient days at issue that is "consistent with the underlying statutory scheme in a substantive sense" and reflects that the agency has "considered the matter in a detailed and reasoned fashion." *ITT Indus., Inc. v. NLRB*, 251 F.3d 995, 1004 (D.C. Cir. 2001).

46.  The Board's decision should also be reversed because it is inconsistent with the plain language and intent of the Secretary's DSH regulation. The patient days in the inpatient child and adolescent psychiatric units of the Plaintiff hospitals must be counted in the Medicaid fraction of the DSH calculation because those units provide "acute care services generally payable under the [inpatient] prospective payment system." 42 C.F.R. § 412.106(a)(1)(ii) (2007). It is undisputed that the beds in the units at issue were Medicare-certified and licensed as inpatient hospital beds. Further, those beds were located in non-exempt areas of the hospitals that are subject to the inpatient prospective payment system, and the units provide services (almost entirely to Medicaid-eligible patients) billed using medical codes that generally would be payable under that system if the patients were entitled to Medicare. In addition, the State Medicaid program and the State legislature have confirmed that the services furnished to Medicaid patients in those units were "acute" inpatient hospital services that receive the same level of care regardless of labels used for reimbursement purposes.

**Count II:  The Board's Decision Reflects Decision-Making Not Based on Substantial Evidence and Arbitrary and Capricious**

47. Plaintiff hospitals repeat the allegations in paragraphs 1–43 of this Complaint as if fully set forth herein.

48. In addition to being contrary to law, the Board's decision is also not based on substantial evidence.  *See* 5 U.S.C. § 706(2)(E).  The Board's conclusion that Plaintiff hospitals' units did not provide care generally payable under the inpatient prospective payment system discredits or otherwise ignores plentiful record evidence demonstrating that the units meet this standard.  The Board also concluded on its own that the labels applied to the units by the State for payment purposes indicated the State's view of the care provided in those units, despite evidence refuting that conclusion.

49. The Board's decision is also arbitrary and capricious because there is inconsistency between the Board's decision here and other DSH policy.  There is no dispute that other Medicaid-covered days furnished in another area of a hospital, the healthy newborn nursery, are included in the DSH Medicaid fraction precisely because those patient days are covered by Medicaid, even if not generally covered by Medicare.  68 Fed. Reg. at 45,417.  There is no rational distinction between the Medicaid-covered inpatient services furnished in a healthy newborn nursery and the Medicaid-covered inpatient services furnished in Plaintiff hospitals' psychiatric units that would provide any rational basis for including the former and excluding the latter patient days in the Medicaid fraction.  It is well-settled that when an agency treats similar situations differently, it must provide a "reasoned analysis" for its disparate treatment.  *See Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).  The agency must explain "*how* it evaluated" the factors that led to its disparate treatment of similar situations and "*why* its evaluation" of those factors led to its disparate treatment.  *See Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety*

16

*Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014) (emphasis in original).  The Board's conclusion that the newborn nursery days are "not relevant" does not meet this test.

### Count III:  The Board's Decision Reflects a Payment Standard Change Adopted Without Observance of Procedure Required by Law

50. Plaintiff hospitals repeat the allegations in paragraphs 1–43 of this Complaint as if fully set forth herein.

51. The Board's decision effectuates a change in the DSH payment standard that was adopted without the observance of various procedures required by law.  In order to change its longstanding policy and practice permitting these inpatient psychiatric days to be counted in the DSH calculation, the agency must undertake notice-and-comment rulemaking.  The Medicare statute requires notice-and-comment rulemaking for a "rule," a "requirement," or a "statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services."  *See* 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1806 (2019); *see also* 5 U.S.C. § 553 (APA rulemaking requirements).  Because the Board's decision changed the substantive legal standard governing Plaintiff hospitals' DSH payments, the Medicare Act's heightened notice-and-comment rulemaking standard was triggered.  *See Allina Health*, 139 S. Ct. at 1817.

52. By statute, Defendant also cannot apply his new interpretation of the regulation retroactively to deprive Plaintiff hospitals of reimbursement for the 2007 cost reporting periods at issue.  Under the Medicare Act, a "substantive change in regulations, manual instructions, interpretative rules, statements of policy, or guidelines of general applicability . . . shall not be applied . . . retroactively" except under limited circumstances not applicable here.  42 U.S.C. § 1395hh(e).  Furthermore, the statute also specifically prohibits the agency from relying upon an unpublished standard to support a retroactive disallowance of Medicare cost reimbursement.  *See*

17

*Chippewa Dialysis Servs. v. Leavitt*, 511 F.3d 172, 176-77 (D.C. Cir. 2007) (citing 42 U.S.C. § 1395hh(c)(1) to require Secretary to publish "all manual instructions, interpretive rules, statements of policy, and guidelines of general applicability" in the Federal Register, at least every three months).

53. It is also well settled an interpretation of a regulation cannot be applied retroactively to penalize a party that did not have "fair notice" of that interpretation. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-59 (2012) (withholding deference to agency regulatory interpretation that would "impose potentially massive liability" for conduct before interpretation was announced, as it "would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires'" (alteration in original) (citation omitted)); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) ("[A]s long ago as 1968, we recognized this 'fair notice' requirement in the civil administrative context."). Plaintiff hospitals did not have the requisite notice in 2007 of Defendant's current reading of the DSH regulation until it received the contractor's disallowances in 2015. Contrary to the Board's conclusion that fair notice was provided when the agency changed its regulations in 2003, CMS itself framed this change as a mere "clarification" that was a "codification of the Secretary's longstanding policy," 68 Fed. Reg. at 45,418, and the contractor continued to allow these days in the DSH calculation in the 2004 through 2006 cost reporting periods. Accordingly, Plaintiff hospitals did not have any, never mind fair, notice of the agency's change until Defendant's contractor made the final payment determinations at issue here in 2015.

## REQUEST FOR RELIEF

54. Plaintiff hospitals request an Order:

    a. declaring invalid and setting aside the final decision excluding patient days attributable to Plaintiff hospitals' child and adolescent inpatient psychiatric units from the

Medicaid fraction used to calculate Plaintiff hospitals' Medicare DSH payment for the 2007 cost reporting periods at issue;

      b.      directing the agency to recalculate Plaintiff hospitals' DSH payments consistent with that Order and to make prompt payment of any additional amounts due Plaintiff hospitals, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

      c.      requiring the agency to pay legal fees and cost of suit incurred by Plaintiff hospitals; and

      d.      providing such other relief as the Court may consider appropriate.

Respectfully Submitted,

/s/ *Stephanie A. Webster*
Stephanie A. Webster
  D.C. Bar No. 479524
Alex J. Talley
  D.C. Bar No. 1020488
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (202) 508-4859
stephanie.webster@ropesgray.com

Counsel for Plaintiffs

Dated: March 7, 2023