**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BAPTIST HEALTHCARE OF OKLAHOMA,
LLC, et al.,

        *Plaintiffs*,

    v.

ROBERT F. KENNEDY, JR.,

        *Defendant.*

Civil Action No. 23-625 (TJK)

**MEMORANDUM OPINION**

Plaintiffs, two Oklahoma hospitals, sue the Secretary of the Department of Health and Human Services over the amount of Medicare reimbursement they received under the Disproportionate Share Hospital ("DSH") program, which provides extra payments to hospitals serving an unusually high percentage of low-income Medicare patients. A hospital's DSH reimbursement amount turns on a complex statutorily prescribed formula linked to the percentage of low-income patients a hospital treats. Plaintiffs challenge the Provider Reimbursement Review Board's decision to exclude from that calculation so-called "patient days" at two psychiatric residential treatment facilities as contrary to law, arbitrary and capricious, and unsupported by substantial evidence under the Administrative Procedure Act. On top of that, they say that the Secretary skipped notice-and-comment rulemaking obligations by adopting a new DSH payment standard through the Board's decision. For the reasons explained below, none of Plaintiffs' challenges holds water. So the Court will deny Plaintiffs' motion for summary judgment, grant the Secretary's cross-motion, and enter judgment for the Secretary.

## I.      Background

### A.      Medicare Statutory and Regulatory Background

Medicare is a federal program that provides Government-funded health insurance to elderly and disabled Americans and reimburses qualifying hospitals for services provided to eligible patients.  *See* 42 U.S.C. §§ 426(a)–(b), 1395ww(d); *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 428 (2022).  It is administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS").  *Health All. Hosps., Inc. v. Burwell*, 130 F. Supp. 3d 277, 283 (D.D.C. 2015).  At issue here is Medicare's reimbursement to hospitals for inpatient services covered under Part A of the Medicare statute.

Until the early 1980s, Medicare reimbursed hospitals retrospectively.  That is, it reimbursed hospitals for the "reasonable cost" of providing inpatient hospital services to Medicare patients, *Me. Med. Ctr. v. Burwell*, 841 F.3d 10, 14 (1st Cir. 2016), and "reasonable cost" meant costs "actually incurred" less those Medicare "deemed unnecessary" in the efficient delivery of health services, *Gottlieb Mem'l Hosp. v. Kennedy*, No. 24-cv-116 (JDB), 2025 WL 901176, at *1 (D.D.C. Mar. 25, 2025) (cleaned up) (quoting *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 39 (1st Cir. 2008)).  This actual-reasonable-cost approach led to high Medicare expenditures because hospitals had "little incentive" to "keep costs down"—at bottom, "[t]he more they spent, the more they were reimbursed."  *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999).  To stem those "escalating costs" and other "perceived inefficienc[ies]," Congress "fundamentally overhauled" Medicare in 1983.  *Id.*  As relevant here, it introduced a system called the Inpatient Prospective Payment System ("IPPS"), which, as its name suggests, shifted Medicare reimbursement from a retrospective to a prospective assessment of the costs of inpatient care.  *See* Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149 (1983); 42 U.S.C. §§ 1395ww(a),

(d).

Now, Medicare "pays hospitals a fixed amount for each patient" based on that patient's *expected* cost of care—based on the patient's diagnosis—and no matter "the actual costs incurred." *Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 703 (D.C. Cir. 2017); *see* 42 C.F.R. § 412.2(a). The IPPS divides medical conditions into categories of related illnesses called "diagnosis-related groups" ("DRGs"). *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 49 (D.C. Cir. 2015). Once a Medicare beneficiary is discharged under the IPPS, Medicare reimburses the hospital at a preset rate that depends on the patient's DRG and other factors not relevant here. *See* 42 U.S.C. §§ 1395ww(d), (g); *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205–06 (D.C. Cir. 2011). What it does *not* depend on is the actual cost to any hospital of treating particular DRG-classified illnesses. Instead, DRG "rates are designed to reflect the amount an efficiently run hospital, in the same region, would expend to treat a patient with the same diagnosis." *Empire Health Found.*, 597 U.S. at 429 (citing 42 C.F.R. § 412.2). If the hospital spends more than that, it takes a financial hit. So this "flat-rate payment system," unlike the actual-reasonable-cost system, "gives hospitals an incentive to provide efficient levels of medical service." *Id.*

But healthcare is complex, and Congress recognized as much. *Empire Health Found.*, 597 U.S. at 429. The IPPS, while pushing hospitals to keep costs low, risked undercompensating certain types of hospitals that serve unique patient populations—*i.e.*, "patients whose hospitalization" is "extraordinarily costly or lengthy," thus generating costs not adequately captured by DRG schedules. *Dist. Hosp. Partners*, 786 F.3d at 49. Congress addressed those concerns in several ways, two relevant here.

First, Congress excluded certain hospitals from the IPPS altogether. *See* 42 U.S.C. § 1395ww(d)(1)(B). That is, it viewed "a number of illnesses and treatments, including psychiatric

care," as "so inherently unpredictable" that categorizing them "within the DRG system" made little sense. *Rye Psychiatric Hosp. Ctr., Inc. v. Shalala*, 52 F.3d 1163, 1167 (2d Cir. 1995). So Congress limited the IPPS's reach to "the amount of the payment with respect to the operating costs of inpatient hospital services . . . *of a subsection (d) hospital* . . . for inpatient hospital discharges." 42 U.S.C. § 1395ww(d)(1)(A)(iii) (emphasis added). And it defined "subsection (d) hospital" to exclude "psychiatric hospital[s]," "rehabilitation hospital[s]," children's hospitals, long-term care hospitals—*i.e.*, hospitals that have "an average inpatient length of stay" exceeding 25 days—and cancer hospitals. *Id.* § 1395ww(d)(1)(B). Congress also specified that a "subsection (d) hospital" "does not include a psychiatric or rehabilitation unit of the hospital which is a distinct part of the hospital (as defined by the Secretary)." *Id.* (flush language). All these listed hospitals (or units) "continue to be reimbursed" based on their actual "costs" and need not classify "patients into ill-ness-based DRGs." *Rye Psychiatric Hosp. Ctr.*, 52 F.3d at 1167.[1]

Second, Congress authorized an "additional payment" to "subsection (d) hospital[s]" that serve an unusually high percentage of low-income patients, so called "disproportionate share hospitals" ("DSHs"). 42 U.S.C. §§ 1395ww(d)(5)(F)(i)(I), (v). This "mark-up," also known as the "DSH adjustment," "reflects that low-income individuals are often more expensive to treat than" others, "even for the same medical conditions." *Empire Health Found.*, 597 U.S. at 429, 431.

A hospital's DSH adjustment consists of the sum of two fractions—colloquially known as the Medicare fraction and the Medicaid fraction. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1105 (D.C. Cir. 2014); *see* 42 U.S.C. § 1395ww(d)(5)(F)(vi). Together, they "are designed to

---

[1] In 1990, Congress directed the Secretary to develop a per-discharge prospective payment system for inpatient hospital services of long-term care hospitals and a per-diem prospective payment system for inpatient hospital services of psychiatric hospitals. *See* Balanced Budget Refinement Act of 1999, Pub. L. No. 106-113, tit. I, subtit. C, §§ 123–24.

capture two different low-income populations that a hospital serves." *Empire Health Found.*, 597 U.S. at 429. The *Medicare* fraction measures the percentage of all Medicare patients who have low incomes, as reflected by their entitlement to supplemental security income ("SSI") benefits. *Allina Health Servs.*, 746 F.3d at 1105.[2] The *Medicaid* fraction, at issue here, captures the number of patients who have low incomes, as reflected by their entitlement to Medicaid, but are *not* entitled to Medicare. *Id.* The statute describes it as:

> [a] fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for [the fiscal year] which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such [fiscal year].

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). Again, in "general terms: [t]he numerator is the number of patient days attributable to non-Medicare patients who are poor," and the "denominator is the total number of patient days." *Empire Health Found.*, 597 U.S. at 431. Dividing the former by the latter yields a certain percentage, and adding it to the one calculated under the Medicare fraction produces the "disproportionate-patient percentage." 42 U.S.C. § 1395ww(d)(5)(F)(v). The higher the percentage, the greater the hospital's DSH bump-up. *See id.* §§ 1395ww(d)(5)(F)(vii)–(xiv). The resulting DSH payment, then, accounts for increased costs that the IPPS would otherwise leave unpaid. *See Empire Health Found.*, 597 U.S. at 429. The

---

[2] Specifically, the Medicare fraction states:

> [a] fraction (expressed as a percentage), the numerator of which is the number of [a] hospital's patient days for [the fiscal year] which were made up of patients who (for such days) were entitled to benefits under Part A of [Medicare] and were entitled to [SSI] benefits . . . , and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under [Medicare] part A.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

DSH statute does not define (at least not explicitly) several key terms, including one central to this case: "patient days."

A few years later, the Secretary issued a notice of proposed rulemaking adding "a definition of patient days used in computing a hospital's" DSH percentage. *Medicare Program; Miscellaneous Changes Affecting Payment for Inpatient Hospital Services*, 53 Fed. Reg. 9,337, 9,337 (Mar. 22, 1988). Under the proposed rule, "patient days" would be "determined by counting those inpatient days attributable only to those areas of the hospital subject to the prospective payment system." *Id.* at 9,339. "Patient days attributable to excluded distinct part units of the hospital, such as psychiatric and rehabilitation units," would "not [be] counted," the Secretary explained, because "the disproportionate share adjustment is a prospective payment system adjustment and is not available to hospitals or units that are excluded from the prospective payment system." *Id.* That followed from the Secretary's "interpretation" of § 1395ww(d)(F)(i), which "specifically provide[s]" for additional payments to "subsection (d) hospital[s]" serving significantly disproportionate numbers of low-income patients, and § 1395ww(d)(1)(B) "defines a subsection (d) hospital" to exclude "a psychiatric or rehabilitation unit of the hospital which is a distinct part of the hospital." *Id.* And because § 1395ww(d)(F)(i) "incorporates" that "definition," "all further references in that subparagraph to hospital"—including in the Medicaid or Medicare fraction—"should be taken to mean a subsection (d) hospital." *Id.* at 9,339–40. Thus, only "data" from "prospective payment hospitals (or the portions of the hospital subject to the prospective payment system) are used in determining both the qualifications for and the amount of additional payments to those hospitals." *Id.* at 9,340. The Secretary published a final rule with no changes. *See Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1989 Rates*, 53 Fed. Reg. 38,476, 38,531–52 (Sept. 30, 1988).

In response to a Ninth Circuit decision interpreting that regulation, the Secretary revisited the calculation of "patient days" in 2003. *See Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates*, 68 Fed. Reg. 27,154, 27,204 (May 19, 2003). In *Alhambra Hospitals v. Thompson*, two hospitals challenged the Secretary's decision to exclude "patient days" attributable to "subacute" skilled nursing care from the calculation of the DSH reimbursement. 259 F.3d 1071, 1072 (9th Cir. 2001). The Ninth Circuit sided with them, holding that "patient days" attributable to units that are not expressly "certified" as distinct units—*i.e.*, as "exempt" from the IPPS—must be included in the "areas of the hospital that are subject to the prospective payment system" and so should be counted in calculating the DSH adjustment. *Id.* at 1074–75. The regulation, the Court observed, referred "to '*areas*' of the hospital that are subject to the prospective payment system," not to "*services*" or "*patients*," and "[s]ince the Hospitals' subacute units were" subject to the IPPS—again, because they were not "certified" as exempt—the "patient days" had to be included in the DSH calculation. *Id.* at 1075.

Following *Alhambra*, the Secretary proposed to "revise" that "regulation[] to be more specific." 68 Fed. Reg. at 27,204. The proposed rule "clarif[ied]"—in contrast to what the *Alhambra* court held—that "patient days are excluded from" the DSH-adjustment calculation "if the nature of the care provided in the unit or ward is inconsistent with what is typically furnished to acute care patients, regardless of whether these units or wards are separately certified or are located in the same general area of the hospital as a unit or ward used to provide an acute level of care." *Id.* The rule thus "focus[ed]" not "on the level or type of care provided to individual patients in a unit, but rather on the level and type of care provided in the unit as a whole." *Id.* at 27,205. That approach, the Secretary "believe[d]," was "more practical" and less "burdensome" than "a patient-by-patient review of whether the care received would be paid under the IPPS." *Id.* at 27,204. So,

7

under the proposed rule, "the number of patient days in a hospital" would "include[] only those days attributable to units or wards of the hospital providing acute services generally payable under the prospective payment system." *Id.* at 27,229.

In the final rule, the Secretary "disagree[d]" with commenters that "bas[ing] the Medicaid days calculation" on "whether or not Medicare pays for the services that are generally provided within a unit" unduly "restrict[ed] the definition of patient days" and was "inconsistent" with the DSH statute. *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates*, 68 Fed. Reg. 45,346, 45,418 (Aug. 1, 2003) ("2003 Rule"). The "DSH formula," he responded, was "intended to provide an add-on payment to inpatient hospitals for additional amounts they incur in treating low-income, Medicare patients," so it was "reasonable to interpret the phrase 'hospital's patient days' to mean only the hospital's inpatient days at a level of care that would be covered under the IPPS as a means to determine an IPPS payment adjustment." *Id.*

The final rule provides:

(ii) For purposes of this section, the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with—

(A) Beds in excluded distinct part hospital units;

(B) Beds otherwise countable under this section used for outpatient observation services, skilled nursing swing-bed services, or inpatient hospice services;

(C) Beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital inpatient prospective payment system at any time during the 3 preceding months (the beds in the unit or ward are to be excluded from the determination of available bed days during the current month); and

(D) Beds in a unit or ward that is otherwise occupied (to provide a level of care that would be payable under the acute care hospital inpatient prospective

> payment system) that could not be made available for inpatient occupancy
> within 24 hours for 30 consecutive days.

42 C.F.R. § 412.106(a)(1)(ii).

### B.    Medicaid Regulatory Background

Along with Medicare, Congress also established a cooperative federal-state program—Medicaid—that funds medical care for low-income persons, regardless of age. *See* 42 U.S.C. § 1396 *et seq.* Participation in Medicaid is voluntary, but a State opting to participate must comply with conditions imposed by the Medicaid Act and HHS regulations to receive federal funding. *See NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 35 (D.C. Cir. 2015). To participate in Medicaid, a State must submit a State Medicaid plan to CMS for approval, detailing financial eligibility criteria, covered medical services, and reimbursement methods and standards. 42 U.S.C. §§ 1396a(a), 1396b. Once a plan is approved, the State will receive financial assistance from the federal government to administer its Medicaid program. *Id.* §§ 1396b, 1396d(b).

Under Medicaid, States can receive matching funds for providing inpatient psychiatric hospital services to children and adolescents, if those services are provided in a psychiatric hospital "or in another inpatient setting that the Secretary has specified in regulations." 42 U.S.C. §§ 1396d(a)(16), (h). The relevant regulations permit inpatient psychiatric services in (1) acute care hospitals with an inpatient psychiatric program and (2) psychiatric residential treatment facilities ("PRTFs"), meaning "a facility other than a hospital[] that provides psychiatric services . . . to individuals under age 21, in an inpatient setting." 42 C.F.R. §§ 441.151(a)(2)(ii), (b), 483.352. PRTFs are generally considered a "less restrictive alternative to a hospital for treating children and adolescents whose illnesses are less acute but who still require a residential environment." *Medicaid Program; Use of Restraint and Seclusion in Psychiatric Residential Treatment Facilities Providing Psychiatric Services to Individuals Under Age 21*, 66 Fed. Reg. 7,148, 7,148 (Jan. 22,

2001); *see also Collins v. Hamilton*, 349 F.3d 371, 376 (7th Cir. 2003) (noting distinction "between the acute care available in a psychiatric hospital setting and the less restrictive treatment provided by a residential facility").

Oklahoma participates in Medicaid, and its regulations echo the federal regulation's distinction between acute psychiatric care and non-acute, residential treatment care.  It defines the former as "care delivered in a psychiatric unit of a general hospital or free-standing psychiatric hospital that provides assessment, medical management and monitoring, and short-term intensive treatment and stabilization to individuals experiencing acute episodes of behavioral health disorders."  Okla. Admin. Code § 317:30-5-95.22(b)(1) (2007).[3]  And it defines a PRTF as "a facility other than a hospital" that provides "non-acute inpatient facility care for recipients who have a behavioral health disorder and need 24-hour supervision and specialized interventions."  *Id.* § 317:30-5-95(a), (b)(4).  "Residential [t]reatment services" provided by such facilities are "designed to serve children who need longer-term, more intensive treatment, and a more highly structured environment than they can receive in family and other community-based alternatives to hospitalization."  *Id.* § 317:30-5-95.22(b)(7).

Oklahoma regulations set out a rigorous pre-authorization system for all inpatient acute and residential psychiatric services.  *See* Okla. Admin. Code § 317:30-5-95.24.  "Requests for admission" to PRTF or acute care units are "reviewed for consideration of level of care, availability, suitability, and proximity of suitable services," *id.* § 317:30-5-95.24(2), and the state's Medicaid agency issues "prior authorization . . . if the recipient meets medical necessity criteria," *id.* § 317:30-5-95.31(a).  This medical necessity review, in turn, requires "an assessment of current

---

[3] Citations to the Oklahoma Administrative Code are to the version "in effect" in 2007, "the time period relevant" to the Board's decision.  AR 23.

and recent behaviors and symptoms to determine whether an admission for inpatient mental illness . . . constitutes the least restrictive level of care necessary." *Id.* § 340:75-16-29(C). Medical necessity criteria differ for acute-care hospitals and PRTFs. For admission to an acute-care psychiatric hospital, a patient must exhibit certain behaviors within the past 48 hours that "present an imminent life threatening emergency," such as "suicide attempts, suicide intent, or serious threat by the patient" or "patterns of escalating incidents of self-mutilating behaviors," among others. *Id.* § 317:30-5-95.25(5). The patient must also "[r]equire[] secure 24-hour nursing/medical supervision" to provide "[s]tabilization" of these "acute psychiatric symptoms" or "extensive treatment under physician direction." *Id.* § 317:30-5-95.25(6). To extend a stay in an acute-care hospital, a patient must continue "to manifest a severity of illness" requiring "an acute level of care." *Id.* § 317:30-5-95.26(2). For admission to a PRTF, on the other hand, a patient must exhibit, within the last 14 days, an "escalating pattern of self injurious or assaultive behaviors as evidenced by" either "suicidal ideation and/or threat," [h]istory of or current self-injurious behavior," "[s]erious threats or evidence of physical aggression," or "[c]urrent incapacitating psychosis or depression." *Id.* § 317:30-5-95.29(5). Further, the patient must require "24-hour observation and treatment" for "[i]ntensive behavioral management," "[i]ntensive treatment with the family/guardian and child in a structured milieu," or "[i]ntensive treatment in preparation for re-entry into community." *Id.* § 317:30-5-95.29(6). To extend a stay in PRTF, the patient must either make "measurable progress toward the treatment objectives specified in the treatment plan" or the "child's condition has remained unchanged or worsened." *Id.* § 317:30-5-95.30(3)–(4).

The standards of care at acute-care psychiatric hospitals and PRTFs differ too. For example, Oklahoma's Medicaid Program requires that a physician treat an acute-care hospital patient three times per week; for PRTFs, once a week is enough. Okla. Admin. Code § 317:30-5-

95.34(c)(1). Patients at acute-care hospitals must receive two hours per week of individual therapy with a psychologist, counselor, or social worker; patients at PRTFs require one hour per week of such additional therapy. *Id.* § 317:30-5-95.34(c)(2).

Finally, Oklahoma uses a different payment method for acute-care hospitals and PRTFs that mirrors the Medicare reimbursement system. For "Acute Level of Care," psychiatric units within acute-care hospitals are paid using a DRG methodology. Okla. Admin. Code § 317:30-5-96.3(b); *see also* 42 C.F.R. §§ 412.1–412.10 (Medicare DRG-based reimbursement for acute-care inpatient hospital services). PRTFs, on the other hand, are reimbursed on a predetermined per-diem basis. Okla. Admin. Code § 317:30-5-96.3(c); *see also* 42 C.F.R. §§ 412.400–412.434 (Medicare per-diem reimbursement for psychiatric hospitals).

### C.    Factual and Procedural Background

Plaintiffs are two Oklahoma hospitals, Integris Baptist Medical Center, Inc. ("Baptist") and Baptist Healthcare of Oklahoma, LLC, d/b/a Integris Bass Baptist Health ("Bass"), who also run off-campus psychiatric treatment facilities for children and adolescents. ECF No. 1 ("Compl.") ¶ 11; Administrative Record ("AR") 12. In 2007—the fiscal year at issue—Baptist operated five "child and adolescent psychiatric units" in a hospital department consisting of 102 inpatient beds, referred to as "Spencer," and located a short drive "away from the [hospital's] main campus." AR 12. Bass operated three "child and adolescent psychiatric units" in a hospital department consisting of 50 inpatient beds, referred to as "Meadowlake," and likewise located just off the hospital's main campus. AR 13.

Baptist and Bass participated in the Oklahoma Medicaid Program as providers of both psychiatric acute care and psychiatric residential treatment care—care provided at a PRTF—to patients under 18, AR 11, 13, and all beds at Spencer and Meadowlake were "dually licensed" for

both types of care, AR 14, 27.[4]  Medicaid patients in these units "did not have to be moved to another bed (or unit)" if Oklahoma's Medicaid Program "switched" them "from being authorized" for acute care to PRTF care.  AR 28.  Moreover, the Oklahoma Healthcare Authority—the state's Medicaid agency—required Spencer and Meadowlake to "maintain separate provider agreements/provider numbers for Acute Care and for PRTF care."  AR 14.  Nearly all patients at both facilities were eligible for services under Oklahoma's Medicaid Program, which primarily paid for the psychiatric services provided at those facilities.  AR 13.  And that program classified and paid for "roughly 95 percent" of Spencer's and "roughly 98 percent" of Meadowlake's total inpatient days as PRTF care.  AR 13, 28.

In November 2007, Baptist and Bass submitted cost reports for that fiscal year, which included the patient days at Spencer and Meadowlake among the claimed Medicaid days in the DSH adjustment calculation.  AR 1233.  Such reports are filed for review with Medicare Administrative Contractors—typically private insurance companies or other entities that compute the specific reimbursement amount each provider is to receive annually.  *See* 42 C.F.R. § 405.1801(b).  During the first audit, the contractor "determined that the Medicaid days claimed" by Baptist and Bass "might include non-acute days"—those at Spencer and Meadowlake, which Oklahoma's Medicaid Program had "classified" as PRTF days.  AR 1233.  And Oklahoma regulations "define[]" such care as "non-acute."  *Id.*  After many years of delay, and a switch in contractors overseeing the audit, Bass and Baptist received a final reimbursement determination in 2015.  AR 1234.

The new contractor "reclassified" *all* days of inpatient care provided at Spencer—32,922 Medicaid days total—"whether identified as for acute care or PRTF care," because "the underlying

---

[4] PRTF care is also sometimes referred to as residential treatment center ("RTC") care.  AR 11.

care did not rise to the level of acute care." AR 11. The estimated loss to Baptist was about $11.4 million in DSH adjustment. *Id.* As for Meadowlake, the contractor reclassified "only" those days "pertain[ing] to" PRTF "care," so any "days associated with acute care remain[ed]" included in the Medicaid fraction. AR 12. Bass's expected loss was $2.3 million. *Id.* Both hospitals appealed that decision to HHS's Provider Reimbursement Review Board. AR 1234.

The hospitals lost—and Bass doubly so. The Board found that "the level of care that Spencer and Meadowlake generally furnished in their respective child/adolescent psychiatric units, *as a whole*, was a psychiatric residential treatment facility . . . level of care," which was "not equivalent to the psychiatric acute care services provided in a short-term acute care hospital subject to the inpatient prospective payment system" and thus "not generally payable under the IPPS." AR 10 (emphasis in original). So, it found, the contractor "*properly* excluded all of the days associated with the units at Spencer (both days for psychiatric acute care and PRTF care) from the Medicaid fraction used in Baptist's DSH calculation." *Id.* (emphasis in original). But the Board found that the contractor "*improperly* excluded" from that fraction "only the PRTF care days associated with the units at Meadowlake" in calculating Bass's DSH adjustment. *Id.* (emphasis in original). Thus, the Board remanded the case to the contractor with instructions "to exclude all days (both psychiatric acute care and PRTF care days) associated with the units at Meadowlake from the numerator and denominator of the Medicaid fraction of Bass's DSH adjustment calculation." *Id.*

The hospitals then sued, challenging the Secretary's DSH adjustment decision under the Administrative Procedure Act ("APA"). In Count I, Plaintiffs allege that the decision is "contrary to the DSH statute," Compl. ¶ 45, and "inconsistent with the plain language and intent" of the DSH regulation, *id.* ¶ 46. In Count II, they assert that the Board's conclusion that the units at Spencer and Meadowlake did not provide care generally payable under the IPPS is "not based on substantial

14

evidence," *id.* ¶ 48, and is "arbitrary and capricious" because it treated patient days at those facilities differently than other similarly situated hospital units, *id.* ¶ 49. And in Count III, they claim that the Board's decision "change[d]" the "DSH payment standard" without observing notice-and-comment rulemaking requirements or giving fair notice to these hospitals. *Id.* ¶¶ 51–53. Plaintiffs and the Secretary now cross-move for summary judgment. ECF Nos. 24, 25.

## II.    Legal Standards

This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which imports the APA's standard of review. *See New LifeCare Hosps. of N.C. v. Becerra*, 7 F.4th 1215, 1222 n.1. (D.C. Cir. 2021). "[W]hen a party seeks review of agency action under the APA," the court "sits as an appellate tribunal," with summary judgment providing the "mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Health All. Hosps.*, 130 F. Supp. 3d at 288 (internal quotation marks omitted). Under the familiar APA standard, a court must "set aside" agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute," as this one is, *id.* § 706(2)(E).

In deciding "whether an agency's interpretation of its governing statute is contrary to law," the Court "must exercise [its] 'independent judgment' and 'apply[] all relevant interpretive tools' to reach 'the best reading of the statute.'" *Env't Def. Fund. v. EPA*, 124 F.4th 1, 11 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394–95, 400 (2024)). And it "may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright*, 603 U.S. at 413. But in an arbitrary-and-capricious challenge, the Court's role is only to ensure that the agency has engaged in "reasoned decisionmaking," *id.* at 395 (citation omitted), by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its

action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  And the Court may not "substitute its judgment for that of the agency." *Id.*  This review is "fundamentally deferential," especially in "matters relating to an agency's areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012).   And finally, substantial-evidence review puts a plaintiff to a "decidedly difficult" task.  *Pomona Valley Hosp. Med. Ctr. v. Becerra*, 82 F.4th 1252, 1259 (D.C. Cir. 2023).  To set aside an "adverse Board decision" on that review, the plaintiff "must show that the evidence was so one-sided as to compel the Board to resolve the disputed factual issues in its favor—the administrative equivalent of a directed verdict for" that party.  *Id.*

### III.    Analysis

Plaintiffs say the Board's decision to exclude "patient days" at Spencer and Meadowlake when calculating their DSH payments is invalid for several reasons, but none persuades.  First, the Board's decision was not contrary to law because the Secretary's interpretation of "hospital's patient days" as including only those days attributable to hospital units providing "acute care generally payable under the prospective payment system" is the "best reading" of the DSH statute.  The Board's decision is also consistent with the agency's regulation defining "patient days," as Plaintiffs effectively concede.  Second, the Board's finding that Spencer and Meadowlake did not, in fact, provide acute care services generally payable under the IPPS was supported by substantial evidence and was not arbitrary or capricious.  The Board adequately explained why its treatment of these facilities' patient days was not inconsistent with how it treats patient days in other contexts, and it adequately considered and rejected Plaintiffs' asserted reliance interests.  Third, the Board's decision did not adopt a new DSH payment standard, so no notice-and-comment rulemaking requirements attached.  Summary judgment is warranted in the Secretary's favor.

A.    **The Board's Decision to Exclude "Patient Days" at Non-Acute Care Units Was Not Contrary to Law**

Plaintiffs argue that the Secretary's decision to exclude the patient days at Spencer and Meadowlake from their DSH payment calculation is contrary to law because it conflicts with the DSH statute. Not so. And although Plaintiffs also purport to challenge the Board's decision as inconsistent with the 2003 implementing regulation, they quibble only with the evidentiary support that underlies the decision. Neither argument is grounds to set aside the Board's decision.

1.    **The Secretary's Interpretation of "Patient Days" in the Medicaid Fraction is Consistent with the Statute**

Plaintiffs challenge the Secretary's interpretation of the phrase "hospital's patient days" in the Medicaid fraction of the disproportionate patient percentage used to determine a hospital's DSH adjustment. To repeat, the Medicaid fraction states:

> [a] fraction (expressed as a percentage), the numerator of which is the number of *the hospital's patient days* for [the fiscal year] which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Medicaid], but who were not entitled to benefits under part A of [Medicare], and the denominator of which is the total number of the hospital's patient days for such [fiscal year].

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). The Secretary interprets "hospital's patient days" to include only "those days attributable to units or wards of the hospital providing acute care services generally payable under the" IPPS, ECF No. 25-1 at 28 (quoting 42 C.F.R. § 412.106(a)(1)(ii)), and the Board found that Spencer and Meadowlake's services did not qualify as such. Plaintiffs, on the other hand, say that the text "dictate[s] inclusion" of patient days in hospital units so long as those units are "part" of a subsection (d) hospital and "not certified" as exempt. ECF No. 24-1 at 29.

The DSH statute does not define the phrase "hospital's patient days" and § 1395ww(d)(5)(F)(vi)(II) does not supply an answer to the key question here—*which* "patient

days" should count toward the DSH adjustment. Both parties reject a literal reading of the provision, which would require counting *all* "days" *any* "hospital" treated Medicaid-eligible "patients" during a given fiscal year. ECF No. 29 at 9; ECF No. 27 at 20. In other words, the parties agree on the obvious: not all hospitals are entitled to a DSH adjustment. Thus, the Court must look beyond § 1395ww(d)(5)(F)(vi)(II) and read the words "hospital's patient days" "in their context and with a view to their place in the overall statutory scheme." *United States v. Little*, 78 F.4th 453, 458 (D.C. Cir. 2023) (quoting *Turkiye Halk Bankasi v. United States*, 598 U.S. 264, 275 (2023)). Doing that here confirms that the Secretary's construction is correct: only patient days attributable to hospital units providing care generally payable under the IPPS count toward a hospital's DSH adjustment. Patient days accumulated at specific units of a hospital that provide care that is generally not payable do not count, regardless of the care provided at other units of the same hospital.

To begin, the parties agree, as they must, that only hospitals subject to the IPPS can receive a DSH adjustment in the first place. ECF No. 24-1 at 29; ECF No. 25-1 at 29. The DSH statute requires the Secretary to "provide . . . for an additional payment amount *for each subsection (d) hospital*" that "serves a significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i) (emphasis added). And only "subsection (d) hospitals" are reimbursed under the IPPS. *See* 42 U.S.C. § 1395ww(d)(1)(A)(iii). That link makes sense: when Congress overhauled Medicare in 1983, it switched those hospitals from an actual-reasonable-cost reimbursement system to a fixed-rate reimbursement system—the IPPS—that is based on the average costs of treating similarly situated Medicare patients, 42 U.S.C. §§ 1395ww(d), (g); *Empire Health Found.*, 597 U.S. at 429, and Congress recognized that this system risked undercompensating hospitals treating a high number of low-income patients, *Empire Health Found.*, 597 U.S. at 429, 431;

*see Dist. Mem'l Hosp. of Sw. N. C., Inc. v. Thompson*, 364 F.3d 513, 520 (4th Cir. 2004) ("The disproportionate share adjustment was authorized to correct for the undercompensation that resulted from the fixed rates of the prospective payment system used for acute care in locations where the hospital had a substantially disproportionate share of low-income patients.").

But Congress excluded some classes of hospitals from the definition of "subsection (d) hospital" subject to the IPPS. *See* 42 U.S.C. § 1395ww(d)(1)(B). Psychiatric hospitals, rehabilitation hospitals, cancer hospitals, and long-term hospitals—those "not generally providing acute care"—continue to be reimbursed under the actual-reasonable-cost system. *Tucson Med. Ctr. v. Sullivan*, 947 F.2d 971, 975 n.5 (D.C. Cir. 1991). More, even "psychiatric or rehabilitation *unit[s]*" that are "distinct part[s]" of a hospital otherwise subject to the IPPS are excluded from the definition of subsection (d) hospital. 42 U.S.C. § 1395ww(d)(1)(B) (flush language). So they are not subject to the IPPS either. *See id.* § 1395ww(d)(1)(A)(iii); *Rye Psychiatric Hosp. Ctr.*, 52 F.3d at 1167 ("Hospitals *or units of hospitals* that treat" illnesses whose "costs [are] not adequately captured by the DRGs" are "excluded from the [I]PPS and instead continue to be reimbursed . . . based on the hospitals' past costs.") (emphasis added).

Other provisions also underscore the close tie between the DSH adjustment and care provided that is reimbursable under the IPPS. First, the DSH adjustment is not available to all subsection (d) hospitals that serve a disproportionate share of low-income patients. Instead, DSH payments are made only when such a hospital provides "inpatient hospital services" that the IPPS pays for. *See* 42 U.S.C. §§ 1395ww(d)(1)(A)(iii), (d)(5). That is, under the IPPS, Medicare pays for "the operating costs of *inpatient hospital services* . . . of a subsection (d) hospital . . . for inpatient hospital discharges" according to the DRG rate, *id.* § 1395ww(d)(1)(A)(iii), and then makes "an additional payment amount" "for discharges" to those subsection (d) hospitals that serve a

disproportionate number of poor patients, *id.* § 1395ww(d)(5)(F)(i)(I). As the Secretary explains, when a subsection (d) hospital provides outpatient services—which are not subject to the IPPS, *see* § 1395ww(d)(1)(A)—then it would receive no DSH payment even if it serves mostly low-income patients. ECF No. 25-1 at 29. Second, the DSH payment correlates with the IPPS reimbursement amount a hospital receives. *See* 42 U.S.C. § 1395ww(d)(5)(F)(ii). The amount is determined by "multiplying" the amount a hospital is reimbursed under the IPPS by "the disproportionate share adjustment percentage." *Id.*[5] So the higher the amount of Medicare reimbursement under the IPPS, the higher the DSH adjustment. *See* ECF No. 25-1 at 29. But a hospital that provides little or no care subject to the IPPS receives a low DSH adjustment (or none at all), no matter how many low-income patients it treats.

With that link between the DSH adjustment and the IPPS system clarified by the statutory context, there is only one way to understand "hospital's patient days" in the Medicaid fraction, and it is the Secretary's. The fraction counts those days attributable to units of a hospital that provide care at a level, or of the type, that would be covered under the IPPS, ECF No. 29 at 6, 8, because it is a carefully tailored add-on payment Congress authorized to ensure that hospitals serving a disproportionate share of low-income patients would not be "undercompensat[ed]" under the "prospective payment system used for acute care," *Dist. Mem'l Hosp.*, 364 F.3d at 520. Those patients typically cost more to treat, and average DRG rates, which "reflect the amounts an efficiently run hospital" would spend on patients "with the same diagnosis," *Empire Health Found.*, 597 U.S. at 429, do not account for those extra costs. But patient days at hospital units that provide care

---

[5] The sum of the Medicare and Medicaid fractions yields a hospital's "disproportionate patient percentage," and other factors set forth in the statute are applied to that percentage to calculate the "disproportionate share adjustment percentage." *See* 42 U.S.C. § 1395ww(d)(5)(F)(iv)–(xiv).

services reimbursed under a different system and not under the IPPS—like days at psychiatric facilities of a subsection (d) hospital—do not count toward a hospital's DSH adjustment. Those services are reimbursed on an actual-reasonable-cost basis, which already accounts for any incremental costs associated with treating low-income patients. Simply put, there is no under-compensation to adjust for.

Plaintiffs' reading is untenable because it would sever the close tie that Congress intended between the DSH payment and a hospital's reimbursement under the IPPS, as reflected by the statutory scheme. They read "hospital's patient days" in the Medicaid fraction to "mean[] days of individuals being treated in areas of the subsection (d) hospital other than distinct part units." ECF No. 24-1 at 30. On their account, because Plaintiffs "unquestionably" are subsection (d) hospitals paid under the IPPS (for acute care provided on their main campuses), and the psychiatric units are "indisputably part" of their hospitals "because they are not certified by Medicare as distinct part exempt units," the patient days at those hospitals must count toward their DSH adjustment. *Id.* at 29 (emphasis removed). Not so.

For starters, the Court agrees with the Secretary that Plaintiffs' attempt to make sense of the phrase "hospital's patient days" by referring to dictionary definitions of "patient" and "days" misses the mark. *See* ECF No. 24-1 at 30; ECF No. 27 at 14; ECF No. 29 at 8. No one disputes that a patient is someone receiving or awaiting medical treatment, or that a day has 24 hours. The question is *which* "patient days" should count, and no dictionary answers that. Neither does the Medicaid fraction formula standing alone.

That said, the Court agrees with Plaintiffs that "hospital[]" in "hospital's patient days" refers to a "subsection (d) hospital." ECF No. 24-1 at 30. But that does not get them far because it does not follow, as Plaintiffs suggest, that a hospital is entitled to receive higher reimbursement

rates for treating Medicare patients in their acute-care services hospitals because they *also* own facilities providing care not subject to the IPPS to low-income patients.

For one thing, Plaintiffs mistakenly pin their hopes on the fact that they chose not to "certify" the psychiatric facilities at issue—Spencer and Meadowlake—as "distinct" parts of their hospital. But no such certification requirement appears in the DSH statute. As noted, the statute excludes from the definition of "subsection (d) hospital" "a psychiatric . . . unit of the hospital which is a distinct part of the hospital *(as defined by the Secretary)*." 42 U.S.C. § 1395ww(d)(1)(B) (flush language) (emphasis added). The Secretary did not define a "distinct part of the hospital" to mean those parts "certified" as distinct. Indeed, in responding to the *Alhambra* decision, he explicitly rejected that approach. That court, as noted, held that "patient days" attributable to subacute skilled nursing care in units not expressly "certified" as distinct should be included in "areas of the hospital that are subject to the" IPPS and therefore count toward the DSH adjustment. 259 F.3d at 1074–75. The Secretary responded by explaining that "in determining a prospective payment hospital's eligibility" for a DSH adjustment, the statute "required" the agency "to consider only those inpatient days to which the" IPPS "applies." 68 Fed. Reg. at 27,204. So he clarified in the 2003 Rule that what matters for deciding which patient days to count is whether the "units or wards of the hospital provid[e] acute care services generally payable under the prospective payment system." 42 C.F.R. § 412.106(a)(1)(ii); *see* 68 Fed. Reg. at 27,204. "Beds and patient days attributable to a nonacute care unit or ward should not be included . . . even if the unit is not separately certified by Medicare as a distinct-part unit." 68 Fed. Reg. at 27,204.

Thus, Congress did two things: it "expressly delegate[d]" to the Secretary "the authority to give meaning to" the words "distinct part of the hospital," *Loper Bright*, 603 U.S. at 394–95, and, by leaving the words "hospital's patient days" undefined, it also left "him with the responsibility

of . . . defining th[ose] (undefined) word[s]," *Gottlieb Mem'l Hosp.*, 2025 WL 901176, at *8 (citing 42 U.S.C. § 1395hh(a)(1) (allowing the Secretary to "prescribe such regulations as may be necessary" to administer Medicare)).  And the Secretary acted within his statutory authority under the best reading of the statute by permitting inclusion in the Medicaid fraction of only those patient days attributable to hospital units providing care "generally payable" under the IPPS.

For another, Plaintiffs do not square their reading of "hospital's patient days"—that it refers to any patient days in hospital units not certified as exempt, whatever level of care provided in those units—with their apparent acknowledgment that the DSH statute ties DSH payments to the IPPS, and they ignore the practical effects of their reading.  ECF No. 24-1 at 29.

Imagine an acute-care hospital in a suburb of Oklahoma City that treated Medicare patients, none of whom are low-income.  That hospital would be reimbursed under the IPPS based on the applicable DRG rates, with no DSH adjustment (because the patients are not low-income).  Now imagine a second hospital downtown that provides rehabilitation care to low-income patients.  That hospital would not receive any DSH adjustment either because, as a hospital providing rehabilitation care, it is not subject to the IPPS.  Instead, it is reimbursed for its actual reasonable costs, thus accounting for the added expense of treating poor patients.  But as the Secretary points out, if the first hospital acquired the second, then under Plaintiffs' reading the hospitals would begin receiving DSH payments so long as they do not certify them as distinct.  ECF No. 25-1 at 32.  That is, of course, not what happened here.  But the point is that Plaintiffs' interpretation divorces the DSH adjustment from the IPPS: in determining how much a subsection (d) hospital is paid under the IPPS, they would include patient days at psychiatric facilities who are reimbursed under a different payment system (Oklahoma's Medicaid) just because they belong to that hospital.  As explained above, the DSH statutory scheme does not permit that.  *See Dist. Mem'l Hosp.*, 364 F.3d at 520

(explaining that "grant[ing]" the DSH adjustment to a hospital "for skilled nursing services" not subject to the IPPS "would result in overcompensation"—"reimbursement for reasonable costs *plus* an adjustment above the reasonable costs" (emphasis in original)).

> ### 2.    The Board's Decision Is Consistent with the Agency's Regulation Defining the Phrase "Hospital's Patient Days"

Plaintiffs also argue that the Board's decision was "inconsistent with the plain language and intent of Defendant's DSH regulation." ECF No. 24-1 at 33; ECF No. 27 at 22. But this argument is really a stab at the record evidence supporting the Board's decision—which Plaintiffs challenge separately—not at the Board's reading of the governing regulation.

To repeat, under the applicable regulation, "the number of patient days in a hospital includes only those days attributable to units or wards of the hospital providing acute care services generally payable under the prospective payment system and excludes patient days associated with" beds in various situations, including "beds in a unit or ward that is not occupied to provide a level of care that would be payable under the acute care hospital" IPPS. 42 C.F.R. § 412.106(a)(1)(ii). Based on that language and the preamble of the 2003 rulemaking, the Board concluded:

> When applying § 412.106(a)(1)(ii) to determine whether a hospital unit provides a level of care that would generally be payable under IPPS, the proper focus must be "on the level and type of care *generally provided in the unit, as a whole*," without regard to whether or not the Medicare program separately certifies the unit. In this regard, § 412.106(a)(1)(ii) operates as "a *proxy measure* that is based upon the location at which the services were furnished and, as explained by the Secretary, a day-by-day or patient-by-patient review is unduly burdensome and contrary to the applicable regulation.

AR 25 (emphases in original). Plaintiffs do not argue that the Board misinterpreted § 412.106(a)(1)(ii) by focusing on "the level and type of care generally provided in the unit[] as a whole." Quite the opposite. They agree that "[t]he 2003 rule—which the Board and Government

rely upon . . . —*properly* emphasizes that the 'focus' of the regulation is 'on the level and type of care generally provided in the unit, as a whole,' 'regardless of whether these units or wards are separately certified or are located in the same general area of the hospital as a unit or ward used to provide an acute level of care.'"  ECF No. 27 at 25 (emphasis added and citations omitted).  Instead, Plaintiffs challenge the Board's application of that standard to the evidence before it.  *See* ECF No. 24-1 at 33 (arguing "[t]he undisputed record evidence shows" that Plaintiffs' "child and adolescent inpatient psychiatric units easily satisfy the standard for inclusion in the DSH payment calculation"); ECF No. 27 at 22 (arguing "the record establishes" that the "patient days at issue qualify" as acute-care services generally payable under the IPPS); *id.* at 25–26 (same).  In other words, Plaintiffs mount an evidentiary challenge to the Board's findings—which the Court addresses below—not an interpretive one that would require the Court to set aside the Board's decision as contrary to the regulation.

### B.     The Board's Decision to Exclude the "Patient Days" at Issue Was Supported by Substantial Evidence and Was Otherwise Reasonable

Plaintiffs next challenge the Board's decision on substantial-evidence and arbitrary-and-capricious grounds.  They argue, first, that the Board erred by finding that Spencer and Meadowlake did not, as a whole, provide acute care services that are payable under the IPPS.  Second, they say the Board failed to explain purported inconsistencies with the agency's view of "patient days" in other contexts.  And third, they contend that the Board did not adequately consider their detrimental reliance interests.  None of these arguments wins the day.

### 1.     The Board's Finding that Plaintiffs' Psychiatric Care Facilities Did Not, as a Whole, Provide Acute Care Services Rests on Substantial Evidence, and Its Reliance on State Classifications Was Reasonable

In a thorough opinion, the Board ruled that patient days at Spencer and Meadowlake must be excluded from Plaintiffs' DSH payment calculation because it found that "every unit, as a

whole, within" these psychiatric facilities "was providing nonacute care" in 2007. AR 37. As detailed below, the Board primarily based that conclusion on its finding that Oklahoma's Medicaid program classified and paid for Spencer and Meadowlake's patient days as psychiatric residential treatment facility care, which is non-acute care under Oklahoma's Medicaid regulations. In so doing, the Board rejected Plaintiffs' argument that the diagnosis-related group codes assigned to patients upon their admission was a better indicator of the level of care the patients received. The Board also found that the average length of patient stays at Spencer and Meadowlake further showed that the level of care provided there was non-acute.

Plaintiffs now assert that the Board unreasonably relied on "State labels used for payment purposes," that it improperly "reject[ed]" Plaintiffs' "evidence that Medicare-payable DRG codes were assigned to all the patients," and that it "over-weighted" the length of the patients' stay at these facilities. ECF No. 24-1 at 35, 37. Whether viewed as an arbitrary-and-capricious or a substantial-evidence challenge, the Court disagrees. The Board reasonably relied on Oklahoma's Medicaid classifications of the patient days at issue, reasonably rejected Plaintiffs' evidence purporting to show that the care provided was acute care, and reasonably considered the length of stay as a proxy for the type of care furnished. And "reasonable findings and conclusions" must stand, "even if" the Court "would have weighed the evidence differently." *Cumberland Coal Res. LP v. Fed. Mine Safety & Health Rev. Comm'n*, 717 F.3d 1020, 1028 (D.C. Cir. 2013).

To begin, the Board looked to how Oklahoma's Medicaid program classified and paid for the patient days at issue, and doing so was reasonable: the program, echoing federal Medicaid regulations, distinguishes between acute care on the one hand, and non-acute PRTF care on the other, and that distinction was directly relevant to the question before the Board—whether the level of care that Spencer and Meadowlake generally provided in their psychiatric units, "as a

whole," was acute care payable under the IPPS.  AR 25.

The Board explained that it considered how Oklahoma's Medicaid program designated and paid for the services at issue because that program, which is "necessarily based" on federal Medicaid regulations, sets clear standards for the types of care that the State will reimburse.  AR 26, 32–34.  Under federal law, states receive matching funds for providing inpatient psychiatric hospital services to children and adolescents, which must be provided in one of three settings: a psychiatric hospital, an acute care hospital with an inpatient psychiatric program, or a non-hospital psychiatric residential treatment facility (*i.e.*, a PRTF).  42 U.S.C. § 1396d(h); 42 C.F.R. §§ 441.151(a)(2)(ii), (b), 483.352.  And the Secretary has observed that the third "non-hospital" setting—"defined as" a PRTF—is "generally a less restrictive alternative to a hospital for treating children and adolescents whose illnesses are less acute but who still require a residential environment."  *Medicaid Program; Use of Restraint and Seclusion in Psychiatric Residential Treatment Facilities Providing Psychiatric Services to Individuals Under Age 21*, 66 Fed. Reg. 7,148, 7,148 (Jan. 22, 2001); *see Collins v. Hamilton*, 349 F.3d 371, 376 (7th Cir. 2003) (noting that federal regulations distinguish "between the acute care available in a psychiatric hospital setting and the less restrictive treatment provided by a residential facility").  AR 34.

The Board also explained that Oklahoma's Medicaid regulations implementing the federal benefit program distinguish between "acute care" on the one hand, and non-acute care provided by PRTFs on the other.  AR 33–34.  Oklahoma's Medicaid program, it recognized, covers "acute care" delivered "in a psychiatric unit of a general hospital or free-standing psychiatric hospital" that provide "short-term intensive treatment and stabilization to individuals experiencing acute episodes of behavioral health disorders."  AR 15 (quoting Okla Admin. Code § 317:30-5-95.22(a), (b)(1)).  And it covers PRTFs (which, like federal law) Oklahoma defines as a "non-hospital" or

"facility other than a hospital" that provides "***non-acute*** inpatient facility care for recipients who have behavioral health disorder and need 24-hour supervision and specialized interventions."  AR 33–34 (emphasis in original) (quoting Okla Admin. Code § 317:30-5-95(a), (b)(4)).[6]  These "residential treatment services" provided by PRTFs are "psychiatric services that are designed to serve children who need longer-term, more intensive treatment."  AR 15 (quoting Okla Admin. Code § 317:30-5-95.22(a), (b)(7)).

Finally, the Board justified its approach by pointing out that participation in Oklahoma's Medicaid program requires "accreditation and State inspection to confirm that" the provider "meet[s]" the program's "conditions of participation," which "are designed to address both the nature and level of care furnished" as shown "by the medical necessity criteria" for admission and continued stay.  AR 33.  For any patient to be admitted (or have their stay extended) to a PRTF, Oklahoma's regulations mandate a rigorous authorization process based on "medical necessity criteria" designed to determine whether "PRTF services rather than acute care services [are] the appropriate level of care."  AR 37–38 & n. 157.  And the "standards" for acute care, the Board observed, differ "material[ly]" from those for PRTF care.  AR 37–43 (detailing requirements).  Thus, the Board found that Oklahoma's Medicaid regulations reflected that the "type of care" at PRTFs is "distinctly different from the care provided by acute care facilities," and so "a psychiatric unit enrolled as a 'PRTF' generally provides 'non-acute inpatient facility care'" not generally payable under the IPPS.  AR 35–36.  And, the Board noted, Oklahoma's regulations set forth different payment methodologies for these types of care: a DRG methodology for acute-care hospitals and a per-diem methodology for PRTFs.  AR 26.  Ultimately, then, if a hospital is reimbursed for

---

[6] The Board noted that "PRTFs are defined to specifically include both freestanding and hospital-based PRTFs."  AR 34; *see* also AR 14.

services classified as PRTF, that means that Oklahoma's Medicaid agency both "authorized *and* paid for [such] services based on its own" assessment that PRTF care, rather than acute-care, "services" were "appropriate." AR 38–39 (emphasis in original).

Relying on this reasonable approach—grounded in how Oklahoma's Medicaid program classified and paid for the patient days at issue—the Board found that Spencer and Meadowlake were, as a whole, providing nonacute care, and so it excluded the relevant patient days from the DSH adjustment. For Spencer and Meadowlake, the Board observed that Oklahoma's "Medicaid was the primary payor (97 percent and 100 percent respectively)" for the 2007 cost year. AR 15. Both facilities participated in the Medicaid program as providers of acute-care hospital services and non-acute PRTF services and that all beds at both facilities were "dually licensed" for both types of care. AR 13–14. And consistent with the regulations, they also maintained separate provider agreements, used different provider numbers when billing for these two distinct services, and were paid differently depending on whether they billed services as acute care (on a DRG basis) or PRTF care (on a per-diem basis). AR 13–16. Based on cost reports from 2007, the Board then found that, while each provided "some psychiatric acute care," PRTF care made up "the overwhelming majority of services" provided and "***paid***" for by Medicaid. AR 37, 39 (emphasis in original). Specifically, those reports showed that roughly 95% of Spencer's and roughly 98% of Meadowlake's total inpatient days were for PRTF care. AR 13, 28, 37.[7] Again, the Board reiterated, this meant that "each patient underwent a *prior authorization process*" to confirm that PRTF

---

[7] The Board "assume[d] the facts [were] materially the same across all of the units at Spencer and Meadowlake," in part because Plaintiffs' said in their post-hearing brief that acute-care and PRTF patient were "comingled within each pod" for Spencer, and Meadowlake did "not segregate the patients" either. AR 27–28 & n. 113. And a peak at "[s]ummary data for FY 2011 discharges from Spencer," which "include[d] break outs across the 5 units," confirmed that each unit "overwhelmingly" provided PRTF care (between 92 and 99.4%). AR 28.

care "was the appropriate level of medical care." AR 37 (emphasis in original). So to the Board, the "conclusion" was "inevitable" that "every unit, as a whole, within Spencer and Meadowlake was providing nonacute care," so "the days associated with these units [could] not be included" as "patient days" to calculate Plaintiffs' DSH adjustment. AR 37.

Plaintiffs challenge the Board's reliance on these Oklahoma Medicaid "labels" distinguishing between acute and PRTF care. AR 36–37; ECF No. 24-1 at 37–40. In their view, this classification reveals nothing about the level of care Spencer and Meadowlake "actually" provided. ECF No. 27 at 33. But the Board reasonably rejected this challenge.

Plaintiffs argue that because Medicaid covers "*inpatient* psychiatric hospital services for individuals under age 21," 42 U.S.C. § 1396d(d)(h)(1) (emphasis added), all services, including PRTF care, are "acute care" and therefore "generally payable under IPPS." AR 31–32; ECF No. 24-1 at 37–38. But under the Medicaid statute and implementing regulations, the Board explained, inpatient psychiatric hospital services can "be furnished" in three different "inpatient settings": (1) an "inpatient psychiatric hospital (or inpatient psychiatric hospital distinct part)" that is exempt from the IPPS, (2) "[a] psychiatric unit of an acute care hospital," and (3) "[a] PRTF," which "is defined as a 'nonhospital' facility providing 'nonacute care.'" AR 32; *see* 42 C.F.R. § 441.151(a)(2); 66 Fed. Reg. at 7,148. Only the second setting would provide acute care generally payable under the IPPS, so just because "PRTF care is 'inpatient' care," that "does not mean that the care provided" there "is 'acute care,' much less 'acute care services generally payable under' the IPPS. AR 32. That explanation passes muster.

The Board also reasonably rejected Plaintiffs' argument that a letter from the CEO of the Oklahoma Health Care Administration and a State Senate resolution supported their position "that the PRTF care" provided at Spencer and Meadowlake "would be generally payable under IPPS."

AR 26; ECF No. 24-1 at 39.  In the letter dated 2008, the CEO stated that he "*believe[d]* that the days of patients in a hospital-based [PRTF] are *acute care days that should be included <u>in the hospital's Medicare DSH calculation</u>*," and that "*[t]he State considers both DRG **and** per diem paid services to be **acute care** services*."  AR 26 (emphases in original).  The Board, however, "decline[d] to give any evidentiary weight" to this "*post hoc* opinion because it [was] based on general and conclusory statements that are not supported by either the [Health Care Authority's]-issued regulations governing under-18 PRTF care or the Federal regulations governing PRTFs (upon which [Oklahoma's] PRTF regulations are necessarily based)."  AR 26.  The "opinion," for example, could not be squared with the relevant federal and state regulations "defin[ing]" PRTF "as a 'non-hospital' or 'facility **other than a hospital**' that provides '***non-acute*** inpatient facility care."  AR 27 (emphases in original).  The Board also added that Plaintiffs "did not present" this CEO "as a witness," and "[a]bsent testimony to allow the Board to understand the foundation for [his] opinion, and the inconsistencies" just noted, "there [was] no evidentiary value to" it.  *Id.*

The Board also acknowledged Plaintiffs' reference to a 2016 Oklahoma Senate resolution stating that "consistent with federal Medicaid law, all Medicaid covered psychiatric services provided to persons under the age of twenty-one . . . who are admitted as inpatients in a hospital in Oklahoma are acute, inpatient hospital services, regardless of the level of State Medicaid reimbursement provided for such services."  AR 27 n. 109 (quoting Okla. Sen. Res. 71, 55th Legis. 2R (May 12, 2016)).  Like the letter, however, the Board found this "*post-hoc* . . . resolution . . . conclusory" and lacking "any foundation" in the relevant federal and state regulations.  *Id.*  The Court is satisfied with this reasoned explanation not to credit this evidence, and Plaintiffs do not attempt to address the inconsistencies identified by the Board.  *See United Steel Allied Indus. Int'l Union v. Pension Benefit Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) ("[I]n judicial review of agency

action, weighing the evidence is not the court's function."); ECF No. 24-1 at 39; ECF No. 27 at 33–34.

Plaintiffs also contend the Board's "reliance on the payment labels" was unreasonable for other reasons, but none persuade. Plaintiffs say they "decided to operate their units with dually licensed beds" only to avoid "mov[ing] patients during their stays," so the "care in the units is the same regardless of the payment label." ECF No. 24-1 at 38. But as the Secretary rejoins, that Spencer and Meadowlake were dually licensed and thus *eligible* to be reimbursed as either acute care or non-acute residential treatment care does not show that they *generally provided* acute care." ECF No. 29 at 16 (emphases added). Indeed, the Board emphasized that Spencer and Meadowlake were not just "enrolled and accredited as PRTFs" but that Oklahoma's Medicaid Program "author-ized, *and* paid for, PRTF services" at these facilities. AR 39. So it was reasonable for the Board to conclude that Plaintiffs' own billing records—which showed that "they were nearly always paid under the *per diem* payment methodology for non-acute residential treatment care"—suggested more about the level of care "actually" provided than did the fact that Spencer and Meadowlake were *licensed* to provide acute care. ECF No. 29 at 16–17; AR 13, 17–18, 476, 532–33, 792, 832.

Plaintiffs also rely on a Medicare contractor's undated "talking points" summarizing an audit of residential treatment facilities at five different Oklahoma hospitals. ECF No. 24-1 at 38; ECF No. 27 at 33; AR 501–04. The contractor observed that "[t]he clear reasoning" psychiatric patients were "reclassified" to PRTF care was "to reduce the financial costs to the Oklahoma Med-icaid to cover the stays," that there were "no differences in the care" provided at acute and PRTF care units, and that "differences in the procedures between [acute care] and [PRTF care] are only to address specific Oklahoma Medicaid requirements that must be met to receive the [PRTF] re-imbursement for those Medicaid eligible patients." AR 501–02. But this evidence does little to

undermine the Board's reasoning that the level of care provided at Spencer and Meadowlake was non-acute.  For one thing, these "talking points" make no findings specific to the level of care provided at these facilities.  For another, as the Secretary points out, the contractor also observed that the PRTF "units" he surveyed "did not contain typical patient care equipment as one would expect to see in most acute care hospitals."  AR 502.  In any event, whatever the evidentiary value of these "talking points," it is not nearly enough for the Court to set aside the Board's conclusion that Spencer and Meadowlake, as a whole, generally provided non-acute care not payable under the IPPS.  *See Pomona Valley Hosp.*, 82 F.4th at 1259 (party challenging an adverse Board decision "must show that the evidence was so one-sided as to compel the Board to resolve the disputed factual issues in its favor").

Trying a different angle, Plaintiffs say the Board should have considered "the assignment of" DRG codes to their patients at the time of admission rather than rely on Oklahoma's classification and payment labels.  ECF No. 24-1 at 35–36; ECF No. 27 at 27–32.  But the Board considered and reasonably rejected the assignment of DRG codes as a relevant benchmark for determining the level of care provided at Plaintiffs' psychiatric facilities.  AR 47.  That is, Plaintiffs presented "[a] listing of all the patients" at Spencer and Meadowlake "and their *admitting* diagnosis" along with "the DRG [code] that would be assigned to those patients based on those diagnoses had the PRTF stay been a Medicare-covered acute care stay."  AR 47; *see* AR 432–33, 799–812.  On Plaintiffs' telling, these "DRG codes reflect the average level of care furnished to patients with particular diagnoses," and thus show that the services provided "would be payable under the" IPPS.  ECF No. 27 at 27.

But the logic of that position runs in circles: of course, *had* the patients at Spencer and Meadowlake been Medicare-eligible and *had* they received acute-care services to treat those

conditions, *then* those services would have been reimbursed under the IPPS. But that assumes the answer to the key issue before the Board: whether the services provided at Spencer and Meadowlake were indeed acute care services payable under the IPPS in the first place. So the Board reasonably concluded that "the primary diagnosis of the PRTF patients, alone, d[id] not have any evidentiary value." AR 48. "Simply because PRTF patients have a diagnosis that *can* be used to assign a DRG," it explained, "does not mean acute care *is* being provided." *Id.* (emphases added); *see id.* ("[N]ot all pneumonia cases require acute care."). And "that a patient's *admitting* diagnosis to a PRTF is the same diagnosis the patient had while receiving acute psychiatric care," it said, "does not mean the patient continues to receive (much less require) acute care services in the PRTF." *Id.* (emphasis added). Indeed, the "universe of qualifying diagnoses" is "the same" for psychiatric acute care facilities and PRTFs, but the "levels" of "treatment" provided in these settings "differ[]." *Id.* (citing Okla. Admin. Code §§ 317:30-5-95.25(1), 05.29(1)). So the Board did not, as Plaintiffs suggest, "speculate[]" that "assignment of the diagnosis code to the patient days was inappropriate" and "substitute[] its own judgment of the care furnished at the units" for that of Plaintiffs' witness, who testified that the codes were "accurate." ECF No. 24-1 at 36; ECF No. 27 at 30–31. Rather, it explained that the patients' primary diagnoses say little about whether Spencer and Meadowlake provided acute care to treat those conditions. And while Plaintiffs stress that the patients at Spencer and Meadowlake were diagnosed with psychiatric conditions that *may* require acute care reimbursable under the IPPS, *see* ECF No. 27 at 29, they tellingly point to no record evidence that the patients *did*, in fact, receive acute care treatment.[8]

---

[8] Plaintiffs say that "there is no difference in the care furnished between 'acute' services paid on a [DRG] basis and 'residential' care paid on a per diem basis," ECF No. 27 at 29, but the evidence they cite—the 2008 letter of the Oklahoma Health Care Administration's CEO and the Medicare contractor's "talking points"—does not support that for the reasons already explained.

To be clear, Plaintiffs are right that DRG codes are used to reimburse hospitals for acute-care services and that such reimbursements are "based on the level of care needed on average for patients with [similar] diagnoses," ECF No. 27 at 30, but they—not the Secretary—appear to "mis-construe[] the purpose and use" of the codes, *id.* at 29.  Under the IPPS, acute-care hospitals subject to the IPPS assign DRG codes "at the time of *discharge*" based on a patient's diagnosis, *Hays Med. Ctr. v. Azar*, 956 F.3d 1247, 1251 (10th Cir. 2020) (emphasis added), and the reimbursement amount then "reflect[s] the estimated average cost of treating a patient" within that group, *New Lifecare Hosps. of Chester Cnty. LLC v. Azar*, 417 F. Supp. 3d 31, 36 (D.D.C. 2019).  So while a DRG code assigned *at discharge from an acute-care hospital* reflects that a patient received acute care reimbursable under the IPPS, assigning such a code based on a patient's "*admitting* diagno-sis"—as Plaintiffs did here—does nothing other than show that this patient's medical condition could require acute care.  And even assuming it showed the patient *did* require acute care at the time of admission, the Secretary correctly explains that it would "not show that the patients *con-tinued to receive* acute care throughout their stay . . . especially where, as here, the patients often stayed for weeks or months at a time."  ECF No. 29 at 20.

On that score, Plaintiffs also fault the Board for "over-weigh[ing]" the patients' average "length of stay."  ECF No. 24-1 at 35, 40.  The Court disagrees that the Board arbitrarily and capriciously considered this factor—which it emphasized was "not dispositive" by any means—in determining whether the type of care provided at Spencer and Meadowlake was generally pay-able under the IPPS.  AR 43.  The Board observed that Oklahoma's Medicaid Program distin-guished between "***short-term*** intensive treatment" provided in acute care settings and "***longer-term***" psychiatric services provided in PRTFs, AR 43 (emphases in original), which "parallels the guidance provided by CMS and Congress when describing the type of services generally payable

under IPPS": "*short-term acute care*." AR 44. The Board also acknowledged that no guidance "definitive[ly] limit[ed]" the IPPS "to short-term care or to specific lengths of stay," even though Congress appeared to have "intended [it] only for short-term care." AR 45. Still, it found that the "average length of stay" at Spencer and Meadowlake was "well above what would be expected in a short-term acute care hospital": the stays ranged "between approximately 34 days to 124 days," which were "much longer than the average IPPS length of stay for IPPS hospitals (5 days) and the minimum average length of stay needed to qualify as a long term care hospital (greater than 25)." *Id.* "Indeed," it added, even when limited to the specific psychiatric diagnoses of patients at Spencer and Meadowlake, the average lengths of stay still exceeded those at IPPS hospitals (between 2.6 and 8 days) and even at long-term care hospitals (14.2 to 24.5 days). AR 45–46. These findings—again while "not dispositive"—"support[ed]" the Board's "conclusion that, on the whole, the care provided to the PRTF patients" at Spencer and Meadowlake was "organized for treatment of conditions 'distinctly unlike' treatment encountered in short-term acute care facilities." AR 47.

Plaintiffs do not dispute the Board's findings about the average lengths of stay at Spencer and Meadowlake, but they argue that the Board arbitrarily relied on this metric because it finds no support in the DSH provision or implementing regulations. ECF No. 24-1 at 40–42. But as Plaintiffs recognize and the Board explained, the length of stay is not *irrelevant* to whether (and how) the IPPS applies, so the Court cannot conclude that the Board relied on "factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; *see* ECF No. 24-1 at 40 (discussing "outlier" lengths of stay); ECF No. 27 at 37 (acknowledging that 42 C.F.R. § 412.1(a) refers to "generally, short-term, acute-care" hospitals that are subject to the IPPS). And that is especially so because the Board recognized that the length of stay was not dispositive and weighed that factor accordingly. *See* AR 45, 47. That the IPPS sometimes pays for long-term hospital stays in acute-

care hospitals does not undermine the Board's reliance on the average length of stay either. ECF No. 24-1 at 42. Quite the opposite: the Board compared the stays at Spencer and Meadowlake to the *average* lengths of stay at acute-care hospitals, which would account for Plaintiffs' noted exceptions, and still found Plaintiffs' "well above" them. AR 45. And to repeat, the Board recognized that nothing in the regulations limited the IPPS to a specific length of stay; it simply concluded—reasonably so—that the length of stay confirmed the Board's finding that the "services provided" at Spencer and Meadowlake did not "resemble the type of care generally payable under IPPS." AR 45, 47.

Finally, Plaintiffs' argument that the Board's "focus on the length of stay . . . contradicts" the Secretary's policy of including in the Medicare DSH calculation patient days for so-called "dual-eligible" patients does not move the needle either. ECF No. 27 at 37; *see* ECF No. 24-1 at 40–41. Dual-eligible patients are individuals who are eligible for both Medicare and Medicaid but have exhausted their Part A Medicare benefits—90 days of inpatient, acute-care hospital services per spell of illness plus a 60-day "lifetime reserve"—because of long stays in acute care hospitals. *See* 42 U.S.C. § 1395d(a)(1); *Cath. Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 917 (D.C. Cir. 2013). Plaintiffs point to HHS regulations addressing which of the two fractions— Medicare or Medicaid—these dual-eligible patients should count, arguing that the Secretary has "conceded that it would be incorrect for these long patient stays to be excluded" altogether. ECF No. 24-1 at 41; ECF No. 27 at 41. But as far as the Court can tell, how the Secretary treats dual-eligible patients for purposes of the DSH adjustment is beside the point. The issue in that context is, as Plaintiffs recognize, not *whether* these days should count toward a hospitals' DSH adjustment, but *how* so, because these patients indisputably received acute care services. So this issue is far afield from the issue before the Board—whether the hospitals provided acute care services

payable under the IPPS in the first place.  And to the extent that Plaintiffs suggest that the Secretary's policy in this unrelated context suggests that some patient stays in acute-care hospitals can last as long as 90 or even 150 days, that's true.  Still, these stays were "fully accounted for in the average length of stay data upon which the Board relied."  ECF No. 29 at 19.

In sum, the Board's finding that the level of care provided at Spencer and Meadowlake was not acute care generally payable under the IPPS—because Oklahoma's Medicaid Program authorized and paid for those services as non-acute PRTF care, and the average length of stay further suggested that the care provided was non-acute—was reasoned and supported by substantial evidence.  The Board also reasonably declined to consider DRG codes as relevant benchmarks for the type of care provided at these facilities, and it considered Plaintiffs' arguments challenging the Board's analysis.  There is, then, a reasoned basis for the Board's decision—just the opposite of an arbitrary and capricious action.

### 2.    The Board Adequately Explained Why Its Decision to Exclude Plaintiffs' Patient Days Was Not Inconsistent with the Agency's Interpretation of the Regulation in Other Contexts

Next, Plaintiffs argue that the Board's exclusion of patient days at Spencer and Meadowlake clashes with how the Secretary "approach[es]" hospital patient days in other contexts, and the Board failed to address those discrepancies.  ECF No. 24-1 at 43.  Again, not so.  The Board's decision was neither inconsistent with the Secretary's view of hospital patient days elsewhere, nor did the Board "fail[] to address the[se] inconsistencies" in its decision.  *Id.*  So it did not act arbitrarily or capriciously.

To begin, the Board adequately explained that excluding patient days at Plaintiffs' psychiatric units from the Medicaid fraction was not inconsistent with the Secretary's policy of including patient days at a hospital newborn ward.  AR 48.  In the 2003 Rule clarifying that "patient days"

include only those days attributable to units of a hospital providing acute-care services generally payable under the IPPS, the Secretary noted an "exception" for "healthy newborn nursery days." 68 Fed. Reg. at 45,417.  Days and costs associated with such newborn nurseries, the Rule explained, "are excluded from inpatient calculations for Medicare purposes" but still "included for determining the Medicaid DSH percentage."  *Id.*  That is because "the costs" associated with a healthy newborn nursery "are not directly included in calculating Medicare hospital inpatient care costs"—Medicare doesn't cover "services for infants"—but "Medicaid does offer extensive coverage to infants, and nursery costs would be directly included in calculating Medicaid hospital inpatient care costs."  *Id.*

Plaintiffs argued to the Board that it would be "arbitrary and capricious to exclude the Spencer and Meadowlake days" from the Medicaid fraction, when "Medicare allows new born days, that are not payable under IPPS," to be included in that calculation.  AR 48.  But the Board explained that the Secretary's policy for newborn days was "irrelevant."  AR 48.  It observed that Plaintiffs had "not alleged that the new born days are *not* acute care days," and the Board "assume[d]" that such days *were* acute care days.  *Id.* (emphasis in original).  The "PRTF care" at Spencer and Meadowlake, on the other hand, was "not acute care (much less psychiatric acute care generally covered under IPPS)."  *Id.*  Also, unlike "PRTF patients at" Spencer and Meadowlake, who "had to qualify for Medicaid based on their own merits for stays that are very long in duration given the 'residential nature' of the care," the Board "suspect[ed]" that "newborn stays are very short in duration."  AR 48–49 n.220.  They are also "unique," said the Board, because "the baby's Medicaid coverage is *through the mother* since the baby, when delivered, would be generally covered under the mother's Medicaid."  *Id.* (emphasis in original).

Plaintiffs assert that the Board "simply" made "unsupported, blanket assertions that" the

distinct treatment of patient days "does not matter."  ECF No. 24-1 at 44.  The Board did no such

thing.  As explained, it reasoned that any perceived inconsistency arose from the distinct nature of

the care at issue in each circumstance: on the one hand, acute care provided at newborn nurseries,

covered by Medicaid in connection with obstetric services provided to the mother, and on the

other, non-acute care furnished at Spencer and Meadowlake.  The Board's focus on the level of

care provided at newborn nurseries is also consistent with the 2003 Rule's explanation that, to be

included in the Medicaid fraction, "the nature of the care provided in the unit or ward" must be

"consistent with what is typically furnished to acute care patients" and so "would be characteristic

of services paid under the IPPS."  68 Fed. Reg. at 45,417.

    Although Plaintiffs elsewhere agree that "the level and type of care" is the proper "focus"

of the 2003 Rule, ECF No. 27 at 25, they appear to argue that excluding newborn nurseries has

nothing to do with the level of care because "the agency specifically discussed the treatment of

newborn days under the heading 'Nonacute Care Beds and Days,'" and described it as an "excep-

tion" to its policy.  ECF No. 24-1 at 44; ECF No. 27 at 40.  Not so.  The Secretary carved out an

"exception" for healthy newborn units not because they do not provide acute care—he said nothing

like that in the Rule—but because the services are not "cover[ed]" by Medicare and thus not "gen-

erally payable under the" IPPS.  68 Fed. Reg. at 45,417; 42 C.F.R. § 412.106(a)(1)(ii).  Indeed,

the Secretary's proposed treatment of newborn nursery days in the rule is immediately followed

by a reference to the rule's "previous[]" "discuss[ion]" that "the nature of the care provided in the

unit or ward [must be] consistent with what is typically furnished to *acute care* patients," and "days

attributable to a nonacute care unit or ward should not be included" in the Medicaid fraction.  68

Fed. Reg. at 45,417.  Plaintiffs also quibble with the Board's reference to the "relatively short"

duration of patients' stay in newborn nurseries, ECF No. 24-1 at 44, but as explained above, using

the length of stay as one factor for assessing whether the care provided is acute is not unreasonable. In sum, the Board adequately explained why excluding Plaintiffs' patient days were not inconsistent with how the Secretary treats newborn nursery days, and the Secretary reasonably concluded that "the differences between the treatment of the healthy newborn nurser[ies]" and Plaintiffs' psychiatric facilities "are justified by differences in those activities." *Health All. Hosps.*, 130 F. Supp. 3d at 304; ECF No. 29 at 21.

Plaintiffs argue that the Board also failed to explain another "inconsistency" stemming "from how the agency treats" patient days for purposes of the *Medicare* fraction, but this argument fares no better. ECF No. 24-1 at 44–45. Plaintiffs asserted before the Board that the Medicare "fraction includes all Medicare patient days in a unit or area of a subsection (d) hospital that is not a distinct-part unit and that provides inpatient hospital services that are payable by Medicare," and "[s]ince these days would have been included" there "***to the extent the patients were eligible for Medicare***, they should also be included as patient days in the Medicaid fraction." AR 48 n.217 (emphasis in original); *see* ECF No. 24-1 at 45. The Board said this was a "red herring" and adequately explained why: Plaintiffs "assume[d]" that their patients were "Medicare Part A eligible when they never billed to those services *as IPPS acute care* and similarly were never as such paid by the Medicare program." AR 48 n.217 (emphasis in original). "PRTFs," it said, "are a creature of the Medicaid program and not the Medicare program." *Id.* So the "real question is" whether "the service provided by a PRTF qualif[ies]" for payment "under the Medicare program as IPPS acute care." *Id.* And as far as Plaintiffs' psychiatric facilities were concerned, the Board said no, because the patients were not admitted to the PRTFs "to *stabilize*" an "***imminent*** life-threatening emergency," and they stayed at the PRTFs "much" longer than "IPPS" or long-term care patients "with similar diagnoses." *Id.* (emphasis in original).

Thus, what Plaintiffs say is inconsistent treatment of patient days for purposes of the Med-icaid and Medicare fraction is far from "unexplained." ECF No. 24-1 at 44. More to the point, no inconsistencies at all undermine Plaintiffs' treatment by the Board. *Id.* Plaintiffs assert the Board "misse[d] the point" by responding that they "never billed" its services "as IPPS acute care" and were never paid by Medicare. *Id.* at 45. "The applicable question" when calculating the Medicare and Medicaid fractions, on Plaintiffs' account, is "whether the units provided services 'generally payable' under the" IPPS. *Id.* But that is the question the Board answered. It found that the care provided at Spencer and Meadowlake was *not* the type of care generally payable under the IPPS, and as explained above, that finding was reasonable and supported by substantial evidence. Plain-tiffs cite no evidence that the Secretary ever includes in the Medicare fraction "patient days" at a hospital or unit of a hospital providing non-acute care to Medicare-eligible patients.[9] And the

---

[9] Plaintiffs cite, without explanation, *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, 27 (D.D.C. 2008), but the relevance of that case is unclear. There, the hospital-plaintiff claimed that CMS improperly omitted several types of patient days from the numerator of the Medicare fraction, including patients who are not eligible to receive SSI payments but have special status under Section 1619(b) of the SSA, which allows them to receive Medicaid assistance based on past entitlement to SSI payments, *id.* at 28. The hospital challenged the exclusion of these patient days from the Medicare fraction—without success, *see id.* at 36–38—along with CMS's process of matching data from the SSA with Medicare inpatient data in CMS's own files, which the hos-pital argued caused CMS to miss patients who should have been included in the numerator of the Medicare fraction, *see id.* at 40–49. The court sided with the hospital on that score, holding that CMS's process for matching Medicare and SSA data failed to use "the best available data" to determine the number of patients entitled to SSI benefits. *Id.* at 58–59. So that case had nothing to do with the level of care provided in the hospital's units, and the two discovery letters Plaintiffs cite from that litigation are irrelevant for that same reason. *See* ECF No. 27 at 40–41.

Plaintiffs also reference a regulation issued in 2010 that was effectively the product of the *Baystate* decision. 75 Fed. Reg. 50,042, 50,277 (Aug. 16, 2010) (explaining that Final Rule was based on the "revised match process used to implement the Baystate decision," which "addressed all of the concerns found by the court"). That rule made no "changes with respect to the final step in determining the SSI fraction," noting that "CMS would continue to sum a hospital's Medicare inpatient days in the acute care part of the hospital (excluding IPPS-exempt units such as rehabil-itation and psychiatric units) where the Medicare beneficiary was simultaneously entitled to SSI benefits." *Id.* at 50,278. If anything, that statement in the Final Rule undermines Plaintiffs'

Secretary, for his part, represents that none "appear[s] to exist." ECF No. 25-1 at 48. In the end, Plaintiffs' claim that the Board's decision was arbitrary and capricious for failing to explain inconsistencies with the agency's view of patient days in other contexts is unavailing.

### 3. The Board Adequately Considered Plaintiffs' Reliance Interests

Plaintiffs make one final push to set aside the Board's decision as arbitrary and capricious by arguing that the Board did not adequately consider their "detrimental reliance interests." ECF No. 24-1 at 46; ECF No. 27 at 42. Plaintiffs effectively claim that the Secretary is barred from applying regulatory requirements to them because they received contrary verbal guidance from a Medicare contractor in 1999, and because the contractor accepted Plaintiffs' inclusion of Spencer and Meadowlake patient days for three years following the 2003 Rule—even though they have little to show that the claimed patient days for those cost years were reviewed for regulatory compliance. The Board adequately considered and reasonably rejected these reliance interests as warranting an outcome in Plaintiffs' favor.

Plaintiffs do not appear to contend that the Board completely glossed over their "reliance interests," nor could they. The Board acknowledged early on in its lengthy opinion "the weighty impact" on Plaintiffs of "revers[ing] the adjustments at issue," noting that several millions of dollars were at stake for both hospitals. AR 25. More to the point, it considered their "final argument" that, even if the Board were right that the 2003 regulation required excluding Plaintiffs' patient days, such an "interpretation" could not "be applied retroactively to penalize" them, as they lacked "fair notice" of it. AR 49. Specifically, Plaintiffs contended that (1) for its 1999 fiscal year, a Medicator Contractor approved inclusion of PRTF care days in its DSH adjustment; (2)

---

position that the Secretary counts any Medicare-eligible patient days in the Medicare fraction without evaluating the level of care provided. *See* ECF No. 27 at 41.

"Meadowlake and Spencer reported PRTF days consistent with this approval for FYs 2000 through 2006," and the Medicare Contractor allowed those days; and (3) the notice of payment reimbursement "was not issued until May 2015, seven years after [Plaintiffs'] respective FY 2007 cost report had been filed." *Id.*

The Board rejected those arguments for several reasons. First, it pointed to "an intervening event"—the Secretary's "clarification on its nonacute days policy in 42 C.F.R. § 412.106(a)(1)(ii)"—and stated that the Board's decision was "consistent with that clarification and the associated revisions to the regulation." *Id.* Second, the Board found "no written evidence" that the Medicare Contractor "approv[ed]" Plaintiffs' "practice of reporting Spencer and Meadowlake days" and "decline[d] to give any evidentiary weight" to Plaintiffs' "claim that they received *verbal* approval/guidance" from the Contractor "for FY 1999." *Id.* & n.225 (emphasis in original).[10] Third, it was "unclear," the Board said, "to what extent Spencer and/or Meadowlake days were scoped for audit during any of the prior years but regardless, there [was] no evidence of any CMS involvement in the audit for those fiscal years. AR 49–50. Fourth, "the record confirm[ed] that, for FY 2007, the Medicare Contractor scoped Spencer and Meadowlake days for review and sought guidance from CMS on the inclusion of the days in the Medicaid DSH calculation." AR 50. And finally, it concluded that the hospitals were "deemed to be on notice of the 2003 rulemaking," which the Board's decision was "consistent with." *Id.*

_____

[10] Before the Board, Plaintiffs called a witness who testified that the hospitals "contacted the then-designated Medicare contractor" and received verbal approval from the then-designated Medicare Contractor, Chisholm. AR 20 & n.83. The Board noted that it was "unclear" whether "the witness directed the inquiry or was present to hear firsthand the alleged guidance . . . , or when the inquiry was made." AR 20. Further, the Board found, "the witness did not identify who at Chisholm (whether by name or position) allegedly gave the guidance," nor "give any particulars regarding the nature and context for the claimed approval/guidance." AR 20 n. 83. Thus, the Board "question[ed] this claim and the extent to which [Plaintiffs] could rely on it and decline[d] to give it any weight." *Id.*

At bottom, Plaintiffs say the Board got it wrong.  First, they disagree with the Board's conclusion that the 2003 regulation gave them fair notice that the hospital days at issue would be excluded from their DSH adjustment.  ECF No. 24-1 at 46; ECF No. 27 at 43–44.  Second, they argue that they "reasonably relied" on "payment determinations made before 2015"—the Medicare Contractor's verbal approval in 1999 that patient days at Plaintiffs' psychiatric facilities would be included in the DSH adjustment and the inclusion of those patient days from 1999 to 2006. ECF No. 24-1 at 46–47; ECF No. 27 at 43–44.  But neither argument has merit, so the Board's decision was not arbitrary or capricious.

Plaintiffs' first claim falters because the Board reasonably concluded that the 2003 rulemaking gave them adequate notice that patient days attributable to psychiatric units providing non-acute care would not be included in the Medicaid fraction.  Plaintiffs, as participants in the Medicare program, have "a duty to familiarize" themselves "with the legal requirements for cost reimbursement."  *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 64 (1984).  Thus, they are considered on notice of an "agency's interpretation" if, "by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty, the standards with which the agency expects parties to conform."  *Hosp. of Univ. of Pennsylvania v. Sebelius*, 847 F. Supp. 2d 125, 135 (D.D.C. 2012) (quoting *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)).

For starters, 42 C.F.R. § 412.106(a)(1)(ii) states that "only those days attributable to units or wards of the hospital providing *acute care services generally payable*" under the IPPS are counted for purposes of the DSH adjustment.  So the focus on the level of care provided—acute care—is "clear" from the "text of the regulation[]."  *Hosp. of Univ. of Pennsylvania*, 847 F. Supp. 2d at 135.  That Plaintiff subjectively "believed that they met that standard" is irrelevant, ECF No.

27 at 43, especially when "the Secretary's statements in the preamble accompanying the [2003] rule" notified Plaintiffs that their interpretation would not hold water, *Univ. Med. Ctr., Inc. v. Sebelius*, 856 F. Supp. 2d 66, 87 (D.D.C. 2012).

For instance, the Secretary explained that, under the amended rule, "patient days" would include "only those days spent in wards or units that would generally provide an acute level of care," 68 Fed. Reg. at 45,418, while the prior rule had limited "patient days" to "areas of the hospital that are subject to the prospective payment system," with no reference to the level of care provided, *see* 42 C.F.R. § 412.106(a)(5) (2003). As the Secretary explained, some courts—including in *Alhambra*—had misread that language as focusing on the status of the hospital unit (whether it was certified as a distinct part) and its physical location (whether it was in the same area of the hospital that provided acute care), not on the level of care provided. *See* 68 Fed. Reg. at 27,204. So while Plaintiffs make much of their decision not to certify their psychiatric units as "distinct part unit[s]," ECF No. 24-1 at 36, the Secretary expressly rejected that reading and "clarif[ied]" that "nonacute care beds in which care provided is generally at a level below the level of routine inpatient acute care" should not "be counted," even absent such "separate[] certif[ication]." 68 Fed. Reg. at 45,417.

In the amended rule, the Secretary also rejected arguments by commenters echoing the thrust of Plaintiffs' position—that, because Plaintiffs are "subsection (d) hospitals" providing acute care services, "patient days" should include even those days attributable to services that Medicare does not pay for because Plaintiffs serve low-income patients in their psychiatric facilities. *See* 68 Fed. Reg. at 45,418; ECF No. 24-1 at 29–33. He explained that the DSH adjustment is "intended" to compensate hospitals for "the higher *Medicare* costs associated with treating" low-income individuals, so it covers "only those days spent in wards or units that would provide

46

an acute level of care," meaning services "that would be covered under the IPPS." 68 Fed. Reg. at 45,418 (emphasis added).

All told, the Board reasonably rejected Plaintiffs' argument that they lacked adequate notice that patient days at psychiatric facilities providing non-acute care would not count toward the Medicaid fraction. And their claim that they thought the days at Spencer and Meadowlake would qualify as "patient days" is, at bottom, a disagreement with the Board's determination that the level of care provided at Spencer and Meadowlake was not acute care payable under the IPPS. It does not, however, speak to whether Plaintiffs were on notice that such days, if indeed attributable to non-acute care, would not be included to calculate a hospital's DSH adjustment.

Plaintiffs' second argument, that they reasonably relied on prior "payment determinations . . . as reflecting the agency's payment standard," fares no better. ECF No. 24-1 at 46. Fleshed out, Plaintiffs claim that a Medicare contractor, as an "agent" of the Secretary, "confirm[ed]" in 1999 that Plaintiffs could include the relevant patient days in the DSH calculation, and consistent with that representation, the agency "continued to allow" these days until 2006. ECF No. 27 at 43–44. And that "continuation of the status quo," Plaintiffs contend, gave them "no reason to think that the 2003 regulation amendment affected their DSH payments." ECF 24-1 at 47. The Board reasonably found otherwise. As explained below, Plaintiffs cannot reasonably rely on verbal approval from an unidentified employee of the Medicare contractor given *before* the 2003 revision to the regulation, nor can they hang their hat on the continued acceptance of patient days at Spencer and Meadowlake for 2004 through 2006 when the facilities were never audited for compliance during those fiscal years.

To be sure, a Medicare contractor does, to some degree, "act[] as the Secretary's agent[] for the purpose of calculating PPS payments." *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d

110, 118 (D.D.C. 2016) (citing *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 401 (D.C. Cir.

2005)).  But its role as a "fiscal intermediary" is "limit[ed]"—it acts as a "conduit" only and does

"not resolve policy questions."  *Heckler*, 467 U.S. at 64.  And the Secretary, for his part, cannot

"be expected to ensure that every bit of informal advice given by [his] agents, in the course of"

administering "a complex program such as Medicare," "will be sufficiently reliable to justify"

reimbursement of "substantial" sums of money.  *Id.*  Medicare participants, who are considered

"acquainted with the nature of and limitations on the role of" Medicare contractors, therefore can-

not reasonably rely on policy judgments of such intermediaries, especially when "the advice" re-

ceived is "oral."  *Id.* at 64–66.

Thus, the Board reasonably rejected Plaintiffs' reliance arguments.  For one thing, it was

hardly reasonable for Plaintiffs to be "satisfied with" the advice given by an unidentified employee

of its Medicare contractor instead of "attempt[ing] to have the question resolved by the Secretary,"

*Heckler*, 467 U.S. at 65, and the verbal approval Plaintiffs say they received was, as far as the

record suggests, never put in writing, *see* AR 20 n.83.[11]  For another, any advice Plaintiffs received

predated the 2003 regulation.  So whatever its value in 1999, Plaintiffs' failure to seek guidance

following that "intervening event" makes their reliance claim all the more unreasonable.  AR 49.

In 2003, the Secretary promulgated a rule "revis[ing]" the agency's "existing regulations to be

more specific" and "clarify[ing]" that "patient days are excluded" from the Medicare fraction "if

the nature of the care . . . is inconsistent with what is typically furnished to acute care patients,

regardless of whether" the specific unit is "separately certified."  68 Fed. Reg. at 45,417.  And, as

---

[11] Plaintiffs quibble that the Board in its decision "questions" their "witness's credibility" even though "at the hearing, [it] only questioned the oral nature of the confirmation and did not raise [any] additional criticisms with the witness."  ECF No. 27 at 44.  But the "oral nature" of any approval Plaintiffs received *is* the problem.

noted, some commenters objected that the Rule's proposed definition of "patient days" was too "restrict[ive]" and inconsistent the DSH statute, *id.* at 45,418, which suggests that the Secretary did, contrary to Plaintiffs' suggestion, send a clear signal that the agency was making a regulatory change, even if it perceived itself as "clarifying" its policy.  *See* ECF No. 27 at 43–44.  In any event, Plaintiffs offer no evidence that they sought guidance on the application of the regulation to its patient days after the new rule went into effect.  Especially given the amount of money at stake, the Board reasonably found that Plaintiffs' reliance on undocumented assurances by an unknown individual before the 2003 rule was unreasonable.

Plaintiffs also put too much weight on the Medicare contractor's apparent "acceptance" of the patient days from Plaintiffs' psychiatric units in the DSH calculation for fiscal years 2004 through 2006.  ECF No. 27 at 44.  First, it is doubtful that Plaintiffs can claim they lacked fair notice of the agency's policy for counting patient days based on any mistaken acceptance by the Medicare contractor when the 2003 Rule itself "supplied the required notice."  *See St. Francis Hosp., Inc. v. Becerra*, 28 F.4th 119, 126 (10th Cir. 2022).  Moreover, as the Board observed, it is not clear that the Medicare contractor even knew that certain patient days were wrongfully included.  The Board explained that it was "unclear" whether "Spencer and/or Meadowlake days were scoped for audit" for the 2004–2006 fiscal years.  AR 49–50.  By contrast, "the record" *did* "confirm[] that, for FY 2007, the Medicare Contractor" indeed "scoped Spencer and Meadowlake days for review and sought guidance from CMS on the inclusion of the days in the Medicaid DSH calculation."  AR 50; *see* AR 1239.  And that led to the later determination that the care provided at the facilities was not acute care generally payable under the IPPS.

Plaintiffs respond by pointing the Court to nearly two-hundred pages of "final payment documentation and audit workpapers from the Hospitals' 1999–2006 cost reports."  ECF No. 24-

1 at 22. But most of these cost reports are irrelevant because they predate the relevant rule, promulgated in 2003. And importantly, the final payment determinations for the fiscal years that could be relevant—2004 through 2006—confirm what the Board said: they do not make clear whether Spencer and Meadowlake days were audited consistently or at all.[12] And if no one looked closely at the patient days Plaintiffs included in their DSH calculation during those years, it is hard to see how a Medicare contractor's "acceptance" of those days renders later application of the Secretary's rule, once the days were audited and CMS's guidance was sought, impermissible.[13] *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 517 (1994) (that "a fiscal intermediary may have allowed reimbursement to petitioner for [graduate medical education] costs that appear to have violated [a regulation] does not render the Secretary's interpretation of that [regulation] invalid"); *St. Francis Hosp., Inc. v. Becerra*, 28 F.4th 119, 126 (10th Cir. 2022). In short, Plaintiffs' reliance on these "prior payment determinations" was not reasonable, and the Board adequately considered and rejected that claim. So it did not act arbitrarily or capriciously.

## C.   HHS Followed Proper Procedure in Implementing Its Policy of Excluding "Patient Days" at Non-Acute Care Units

Finally, Plaintiffs argue that the Board's decision "reflects a new DSH payment standard" that required notice-and-comment rulemaking. ECF No. 24-1 at 49. The Court is, once again,

---

[12] Bass's cost reports include a cover sheet listing the "areas" of the hospital that were "selected for audit"—like "physical therapy," "research costs," or "patient days," among many other options. AR 656, 664, 674. But Bass's reports for fiscal years 2004 and 2006 do not include "patient days" among the areas selected for audit, *see* AR 656, 674, although the 2005 report does, *see* AR 664. Baptist's cost reports contain no such cover sheet, but—at least for fiscal years 2004 and 2005—the reports note that a "less than full scope audit was made." AR 729, 736. And the scope of those audits apparently did not include patient days at Baptist's psychiatric facility; at the very least, no report (including the 2006 report) mentions them anywhere. *See* AR 751–57.

[13] Plaintiffs also have pointed the Court to no evidence that the care provided at Spencer and Meadowlake during fiscal years 2004 through 2006 was the same as in 2007.

unpersuaded.  The Board's decision did not "change" a "substantive legal standard."  The 2003 rule, which followed all procedural requirements, did that.  And the Board's decision was a straightforward application of the rule.

The Medicare statute requires that any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing . . . the payment for services" under Medicare must be "promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).  And any such regulation is subject to a 60-day notice-and-comment period.  *Id.* § 1395hh(b)(1).  Plaintiffs are correct that an agency cannot escape its notice-and-comment obligations "by claiming that [it] was acting by way of adjudication rather than rulemaking."  ECF No. 27 at 47 (quoting *Allina Health Servs. v. Price*, 863 F.3d 937, 945 (D.C. Cir. 2017), *aff'd sub. Nom. Azar v. Allina Health Servs.*, 587 U.S. 566 (2019)).  But the problem for Plaintiffs is that the Board's decision did not change or establish a "new DSH payment standard."  *Id.*  Rather, it applied the standard for determining "patient days" that is reflected in the 2003 rule.  In that rule—which underwent notice-and-comment procedures—the Secretary clarified certain aspects of the agency's policy for calculating the number of patient days in the Medicaid fraction.

Briefly again, the agency amended its preexisting rule to "clarify" that "patient days" includes "only those days spent in wards or units that would generally provide an acute level of care."  68 Fed. Reg. at 45,418.  It did so in part because some court decisions suggested that the agency's "rules" for treating patient days "were not sufficiently clear" to permit exclusion of "patient days" based on "the nature of the care provided in the unit or ward" if it "is inconsistent with what is typically furnished to acute care patients," no matter whether the unit or ward is "separately certified."  *Id.* at 45,417.  Thus, § 42.106(a)(1)(ii)'s directive that "patient days" includes "only those days attributable to units or wards of the hospital providing acute care services generally

payable under the" IPPS.  The agency also clarified that determining whether a unit indeed "pro-vide[s] acute care services" would be based on "the level of care that is *generally provided* in particular units or wards."  *Id.* at 45,418 (emphasis added).  It acknowledged that "the intensity of care may vary within a particular unit," but explained that the alternative—determining "on a day-by-day basis" whether "a particular patient in a particular inpatient bed is receiving a level of care that would be covered under the IPPS"—was "administratively inefficient and impractical."  *Id.* at 45,417–18.

The Board's decision implemented that directive in deciding whether to include patient days (both psychiatric acute care and PRTF care days) associated with the units at Spencer and Meadowlake in the Medicaid fraction of Plaintiffs' DSH adjustment calculation.  *See* AR 22–25.  Based on its reading of the DSH statute, the regulation, and the Secretary's 2003 rulemaking, it concluded that, when determining "whether a hospital unit provides a level of care that would generally be payable under IPPS, the proper focus must be 'on the level and type of care *generally provided in the unit, as a whole*,' without regard to whether or not the Medicare program separately certifies the unit."  AR 25 (emphasis in original).  Plaintiffs do not appear to quarrel with this reading.  *See* ECF No. 27 at 25.  All that was left for the Board to do was apply that standard to the patient days at Spencer and Meadowlake.[14]

_____

[14] For that reason, Plaintiffs reliance on *Allina Health Services* is misplaced.  There, the Secretary tried to enforce a new Medicare reimbursement policy—that Medicare Part C partici-pants counted in the Medicare fraction—to hospitals' DSH calculations for fiscal year 2012.  587 U.S. at 571.  A 2004 regulation implementing that standard had been vacated on procedural grounds, so it could not rely on that, and even though the agency in 2013 issued a new rule rea-dopting that policy, it could not rely on that rule either because it applied only prospectively.  *Id.*  So the agency "posted on a website a spreadsheet" noting that Part C patients would be included in the fraction.  *Id.*  The Supreme Court held that the Secretary had violated the Medicare Act "by skipping its notice-and-comment rulemaking obligations," *id.* at 572, and rejected the agency's argument that the new policy was exempt because it was merely filling a "gap" left by the Medicare

Plaintiffs, for their part, identify no "standard" required to be set out by rule that was not. Echoing their lack-of-fair-notice arguments, Plaintiffs claim that the 2003 Rule "did not," in fact, "address the change at issue here." ECF No. 27 at 48. Though Plaintiffs do not explain what that "change" is specifically, they point out that the agency asserted it was merely "clarif[ying]" its "[l]ongstanding" policy. *Id.* (quoting 68 Fed. Reg. at 45, 418). Thus, the argument presumably goes, the standard leading to exclusion of patient days at Spencer and Meadowlake must have come from the Board's decision itself. But Plaintiffs' cherry-picking of terms like "clarifying" and "longstanding policy" ignores that the Secretary also repeatedly referenced "revis[ions]" to the agency's policy for determining what patient days to include in the Medicaid fraction. 68 Fed. Reg. at 45,417–18; *see also id.* at 45,415 ("[W]e are combining in this final rule our discussion of *changes* to the policies for counting beds and patient days . . . .") (emphasis added). More importantly, as the Secretary puts it, Plaintiffs' "argument ignores the entire purpose of the 2003 rulemaking and the nature of changes it introduced," which he deemed necessary because of the apparent lack of clarity in the agency's existing regulation: that "the focus of the inquiry" should be "the level of service generally provided," not the "status and location of the hospital." ECF No. 29 at 29.[15]

In sum, because the Board did not "adopt a new substantive standard" in its decision, no

---

statute and existing regulations, *id.* at 583–84. It explained that "when the government establishes or changes an avowedly 'gap'-filling policy, it can't evade its notice-and-comment obligations." *Id.* at 583. But *Allina* does not fit here. As explained, the Secretary did not, through the Board's decision, establish or change any standard for reimbursement not already contained in the regulation itself. The Board was merely implementing it. So notice-and-comment rulemaking under § 1395hh was not required.

[15] Plaintiffs also repeat their claims that they "did not receive the requisite fair notice" and "reasonably expected" to get reimbursed, ECF No. 27 at 49, but the Court has already rejected those arguments.

notice-and-comment obligations attached.  So Plaintiffs' final challenge to the Board's decision fails too.

**IV.    Conclusion**

For all the above reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and grant the Secretary's Motion for Summary Judgment.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 15, 2025